The MINNESOTA CHIPPEWA TRIBE, et al., The Red Lake Band, Plaintiffs,

v.

The UNITED STATES, Defendant.

Nos. 19, 188 and 189–A.

United States Claims Court.

Nov. 20, 1986.

Reconsideration Denied Feb. 3, 1987.*

Marvin J. Sonosky, Washington, D.C., for plaintiffs; Reid Peyton Chambers and Rodney J. Edwards, of counsel.

Joseph S. Davies, with whom was Asst. Atty. Gen. F. Henry Habicht II, Washington, D.C., for defendant.

## OPINION

BRUGGINK, Judge.

These cases involve numerous claims filed by the Minnesota Chippewa Tribe and the Red Lake Band for allegedly illegal or otherwise, improper actions by the United States in the conduct of its affairs with the plaintiff Indians over the more than a century and a half since the parties first attempted to regularize their relationship by treaties. Currently before the court are eight motions for summary judgment, four filed by plaintiffs and four by defendant. Disposition of these motions will resolve only a minor portion of the pending cases, but any progress made in matters as aged as these will, presumably, be beneficial in speeding the day of final resolution to the mutual advantage of both parties.

## BACKGROUND

As is to be expected in cases of this nature, there is a lengthy history of dealings between the parties. Some discussion of that history is a necessary predicate to understanding the issues now before the court.

## A. The Chippewa People

The Chippewa was one of the largest tribes of Indians north of Mexico and by 1972 it had become the largest. They are an Algonquian speaking tribe whose name is the popular adaptation of the word "Ojibway." Their early range was over an extensive area, mainly north of Lakes Superior and Huron. Beginning in the seventeenth century they expanded into western Saskatchewan and, in part by driving out other Indian tribes, such as the Fox, the Dakota, and the Sioux, into what are now Michigan, Wisconsin, Minnesota and North Dakota.

In early historic times the Chippewa settled in widely scattered, small, autonomous bands. "Thus the term 'tribe' is applicable to the Chippewa-Ojibwa in terms of a common language and culture, but it does not apply in the political sense that an overall authority or unity was present."[1] Ritzenthaler, *Southwestern Chippewa*, in 15 Handbook of North American Indians 743 (B. Trigger ed. 1978). By the start of the nineteenth century, the tribe could be divided into four groups: the Northern Ojibwa or Salteaux, north of the Great Lakes; the Plains Ojibwa or Bungee in southern Saskatchewan and Manitoba; the Southeastern Ojibwa in Ontario and the lower peninsula of Michigan; and the Southwestern Chippewa, who occupied northern Wisconsin and Minnesota. The last group are direct forebears of plaintiffs.

During most of the nineteenth century the various Chippewa bands in Minnesota lived on twelve separate reservations: the White Earth, Red Lake, Leech Lake, Cass Lake, Lake Winnibigoshish, White Oak Point, Mille Lac, Fond du Lac, Grand Portage, Bois Forte, Deer Creek, and Vermillion Lake reservations. Title to these lands was held by the Indians of each reservation. The Indians living at a single reservation were frequently considered a band, and the band was generally known by the name of the reservation.

## B. The Early Treaties

Beginning as early as 1785, the United States entered into numerous treaties with the Chippewa Nation, alone or in combination with other tribes, or with some portion of the Chippewas. For purposes of these cases, the most important treaties were those involving land, granting reservations in Minnesota to, or accepting cessions from, the various bands in return for money, assorted goods, and services. For example, on July 29, 1837 (7 Stat. 536) the Chippewa ceded an area known as Royce 242, and on August 21, 1847 (9 Stat. 908) they ceded Royce 269.[2] By treaty of September 30, 1854, 10 Stat. 1109, a cession of Royce 338 and 339 in Minnesota was made, certain Indian lands were reserved, and the Southwestern Chippewa were divided into the Chippewa of Lake Superior and the

1. In *Montoya v. United States,* 180 U.S. 261, 21 S.Ct. 358, 44 L.Ed. 521 (1901), the Supreme Court defined the terms "tribe" and "band" as follows:

> By a "tribe" we understand a body of Indians of the same or a similar race, united in a community under one leadership or government, and inhabiting a particular though sometimes ill-defined territory; by a "band," a company of Indians not necessarily, though often of the same race or tribe, but united under the same leadership in a common design. While a "band" does not imply the separate racial origin characteristic of a tribe, of which it is usually an offshoot, it does imply a leadership and a concert of action. How large the company must be to constitute a "band" within the meaning of the act is unnecessary to decide. It may be doubtful whether it requires more than independence

of action, continuity of existence, a common leadership and concert of action.

*Id.* at 266, 21 S.Ct. at 359.

Under 25 U.S.C. § 479 (1982), "tribe" has more recently been defined as "any Indian tribe, organized band, pueblo, or the Indians residing on one reservation."

2. The various cessions are referenced by "Royce" numbers, so called because Charles C. Royce, who worked for the Smithsonian Institution, compiled a listing of all Indian land cessions in the United States. The ceded areas were mapped and charted and given sequential numbers based on the order in which the cessions occurred. Certain of the reservations were also numbered in this way. *See* J.W. Powell, Eighteenth Annual Report of the Bureau of American Ethnology 1896–97, at 644 *et seq.* (1899).

Chippewa of Mississippi. By this treaty, the two groups agreed on a north-south boundary line running through the eastern part of Minnesota to effect a division of their lands between them. The Lake Superior Chippewa relinquished their interest in the lands to the west of the boundary to the Mississippi Chippewa, the historical predecessors of many of the plaintiffs.

On February 22, 1855, by 10 Stat. 1165, the United States entered into a treaty with eight bands of Chippewa for a cession of lands (Royce 357) in return for specific reservations (Royce 358–360 and 453–457).[3] One reservation, Royce 454, was set aside for the Mille Lac band. It comprised 61,028.14 acres. In the following years a Sioux uprising took place in Minnesota and because of their common grievances against the government, Hole-in-the-Day, chief of the Chippewa in Minnesota, was exhorted to join the Sioux. He agreed to do so. The chief of the Mille Lac band, however, refused to accede to Hole-in-the-Day's plan and instead took 800 men to the defense of Fort Ripley. This ultimately thwarted the attempted union and caused the band to remain at peace with the United States.

On March 11, 1863 (12 Stat. 1249) and May 7, 1864 (13 Stat. 693) the United States entered into two substantially similar treaties with certain Chippewa bands for the cession of certain reservations established by the 1855 treaty, in return for the establishment of a new reservation. At that time, the efforts of the Mille Lac band were remembered. Article XII of both treaties recites "[t]hat, owing to the heretofore good conduct of the Mille Lac Indians, they shall not be compelled to remove [from their reservation to White Earth] so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites."

The 1863 and 1864 treaties notwithstanding, between 1871 and 1889 55,976.42 acres of the Mille Lac land were filed against under the public land laws, i.e., homestead and preemption entries were made on over ninety percent of it. On July 4, 1884, Congress provided that none of that land should be patented or disposed of until there was further legislation. Ch. 180, 23 Stat. 76, 98. In 1889, with the passage of the Nelson Act, discussed in the next section of this decision, Congress determined that such further legislation had been enacted.

On March 19, 1867, as a result of 16 Stat. 719, the reservation established by the 1863 and 1864 treaties (Royce 507), was ceded to the United States except for two reserved areas, Royce 508 and 509, comprising 36 townships. These became known as the White Earth Reservation.

Under the authority of the Indian Appropriation Act of May 15, 1886 (ch. 333, 24 Stat. 29, 44), two agreements (known as the White Earth Agreements) were negotiated for cession of reservations by seven Chippewa groups in return for allotments on the White Earth Reservation, and by the Red Lake band for cession of about two-thirds of its reservation in exchange for allotments on the diminished portion. The two agreements were never ratified by Congress. The Committee on Indian Affairs of the House of Representatives recommended disapproval of the agreements because it took the view that they were too generous to the Red Lake band, by allowing it both to keep a large land mass and to receive the proceeds from the sale of the remaining parts. The Committee based

---

**3.** A "reservation" generally refers to the land remaining after the cession of other areas to the United States. In discussing the situation that existed after the 1863 treaty with the Chippewa, the Supreme Court noted that the effect of the cession was to leave a tract of land for occupation by the tribe, which tract was then referred to as a "reservation."

Now, in order to create a reservation it is not necessary that there should be a formal cession or a formal act setting apart a particular tract. It is enough that from what has been done there results a certain defined tract appropriated to certain purposes. Here the Indian occupation was confined by the treaty to a certain specified tract. That became, in effect, an Indian reservation.
*Minnesota v. Hitchcock*, 185 U.S. 373, 389–390, 22 S.Ct. 650, 656–657, 46 L.Ed. 954 (1902).

this view in part on information showing that all of the reservations at issue covered 4,731,596 acres and were occupied by 7,496 Chippewa. Of those totals, the 1,103 Red Lake Indians had a reservation of 3,200,000 acres. Thus, fewer than 15% of the Indians owned more than 68% of the land.

Two other pieces of legislation were enacted during this time period which are relevant to the pending motions. In 1850, ch. 84, 9 Stat. 519 ("Swamplands Act") provided that all swamp and overflowed lands within the state of Arkansas unfit for cultivation, which remained unsold at the passage of the statute, were granted to the state. That law also provided for its extension to all other states in the Union. By its terms this law was inapplicable to Minnesota, which did not become a state until 1858. In 1860, however, ch. 5, 12 Stat. 3, provided that the terms of the Swamplands Act,

> be, and the same are hereby, extended to the States of Minnesota and Oregon: *Provided,* That the grant hereby made shall not include any lands which the government of the United States may have reserved, sold, or disposed of (in pursuance of any law heretofore enacted) prior to the confirmation of title to be made under the authority of the said act.

## C. The Nelson Act

Of all of the treaties and legislation affecting the Chippewa tribe, the act of January 14, 1889 (ch. 24, 25 Stat. 642), entitled "An Act for the relief and civilization of the Chippewa Indians in the State of Minnesota" and known as the Nelson Act, is by far the most important. That act started as H.R. 7935, the House Committee on Indian Affairs' substitute for the two White Earth cession agreements made pursuant to the 1886 appropriation act. It followed the outline of those agreements, and thereby differed from most earlier treaties because it provided for the sale of the ceded land and the establishment of a trust held by the United States for the tribe, rather than for a cession in return for a sum certain paid to the Indians. Be-

cause of its centrality to the issues in these cases, the significant terms of the Nelson Act are set forth in some detail below.

The first section of the Nelson Act provided for the appointment of three commissioners to negotiate for the cession of all of the Chippewa reservations in Minnesota except those parts of the White Earth and Red Lake Reservations necessary to fulfill allotments made directly to individual Indians. The cession for each reservation except Red Lake was to be effective upon the written assent of two-thirds of the male adults over 18 years of age of the band living on that reservation. "As to the Red Lake Reservation, the cession and relinquishment shall be deemed sufficient if made and assented to in like manner by two-thirds of the male adults of all the Chippewa Indians in Minnesota." This section also provided for the taking of a census by commissioners, and that any allotment which had previously been made to any Chippewa would not be disturbed without the individual consent of the allottee.

Section 2 provided only for the bonding and compensation of the commissioners.

Section 3 provided for the removal of all Chippewa except those on the Red Lake Reservation to the White Earth Reservation; for the allotment to those living on those reservations of lands on either reservation; and for any other Indian, to take an allotment on the reservation on which he resided in lieu of removal to White Earth.

Under section 4 the ceded lands were to be surveyed and divided into 40 acre lots to ascertain on which lots pine timber was standing or growing (called "pine lands" in the act), how much pine it contained, and its value, to be measured at a rate of not less than $3.00 per thousand feet. The Secretary of the Interior was given authority to approve, modify, or reject all such appraisals. In addition to providing for compensation of the examiners, this section classified all lands other than "pine lands" as "agricultural lands."

Section 5 required the advertisement and public auction of the pine lands in 40 acre parcels for no less than their appraised

value. The parcels not sold at auction were subject to private sale at their appraised value.

Section 6 provided for disposition under the homestead law of the agricultural lands not allotted to the Chippewa. Homesteaders were to be entitled to a patent on their land after five years of residence and payment of $1.25 per acre, divided into five equal, annual installments. A proviso within section 6 stated:

[t]hat nothing in this act shall be held to authorize the sale or other disposal under its provision of any tract upon which there is a subsisting, valid, pre-emption or homestead entry, but any such entry shall be proceeded with under the regulations and decisions in force at the date of its allowance, and if found regular and valid, patents shall issue thereon....

The heart of the act was section 7. It provided:

[t]hat all money accruing from the disposal of said lands in conformity with the provisions of this act shall, after deducting all the expenses of making the census, of obtaining the cession and relinquishment, of making the removal and allotments, and of completing the surveys and appraisals, in this act provided, be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest at the rate of five per centum per annum, payable annually for the period of fifty years, after the allotments provided for in this act have been made....

One-half of the interest which would accrue was to be paid in cash in equal shares annually to the heads of families and guardians of orphan minors; one-fourth was to be paid the same way to all others; and the remaining one-fourth was to be used to establish and maintain a system of free schools for the Chippewa. As to the proceeds of the sales themselves,

[a]t the expiration of the said fifty years, the said permanent fund shall be divided and paid to all of said Chippewa Indians and their issue then living, in cash, in equal shares: *Provided*, That Congress may, in its discretion, from time to time, during the said period of fifty years, appropriate, for the purpose of promoting civilization and self-support among the said Indians, a portion of said principal sum, not exceeding five per centum thereof.

Finally, apparently in recognition of the delay which would be necessitated by the process of survey, examination, classification, and sale, section 7 provided for the United States to pay to the Chippewa $90,-000.00 annually, in advance, as interest once the allotments were made, and,

[u]ntil such time as said permanent fund, exclusive of the deductions herein before provided for, shall equal or exceed the sum of three million dollars, less any actual interest that may in the meantime accrue from accumulations of said permanent fund ... and whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess, for all the advances of interest made as herein contemplated and other expenses hereunder.

Section 8 provided for the appropriation of funds for the tasks and first advance interest payment required by the act, and for a report to Congress after their expenditure.

After the three designated commissioners met with the various groups, ten cession agreements were negotiated between July 8 and November 21, 1889. The requisite number of adult males on each reservation assented, as did two-thirds of the adult male Chippewa to the cession of the Red Lake Reservation. When President Harrison signed the Nelson Act on March 4, 1890, it became effective. Thus were ceded to the United States 3,669,200.96 acres of reservation land (Royce 338, 339, 454, 483, 484, 706, 708, and 710) of the 5,289,-505.56 formerly held by the Chippewa. Of that amount, 2,905,921.28 acres were contributed by the Red Lake band out of its former 3,569,694.29 acre reservation. Its diminished reservation, 663,773.10 acres,

was Royce 707. The White Earth Reservation, onto which the act directed the removal of most Chippewa, was diminished by over 89,000 acres to 707,356.86 (Royce 709).

No allotments were made on the diminished Red Lake Reservation but 8,600 Chippewa other than Red Lake band members were eventually allotted lands on White Earth (5,177) or the reservation on which they lived prior to the Nelson Act. *See Chippewa Indians of Minnesota v. United States*, 80 Ct.Cl. 410, 446 (1935).

### D. Post–1889 Legislation

After the passage of the Nelson Act, the first legislation relevant to these cases was ch. 479, 31 Stat. 179 (codified at 43 U.S.C. § 179) (1982), dated May 17, 1900. Known as the Free Homestead Act, it provided that certain settlers under the homestead laws on lands acquired from Indian tribes who resided on the land for the period of time required by law were entitled to a patent on that land without any further payments. As to Nelson Act lands, the United States paid the Chippewa the difference between monies collected under the homestead laws and $1.25 per acre.

The first Congressional enactment in this period which directly affected only the Chippewa was dated June 27, 1902 (ch. 1157, 32 Stat. 400). It did not call for the cession of any Indian land. It specifically amended sections 4 and 5 of the Nelson Act to provide for advertisement and sale by sealed bid of the pine timber on the pine lands separate from the land itself, for a minimum price of $4.00 per 1,000 board feet of Norway pine and $5.00 per 1,000 board feet of white pine. After all of the timber had been removed from the pine land, it was to be treated as agricultural land open to homestead entry.

The amendment also provided for the creation of 200,000 acres of "forestry lands." The Forester of the Department of Agriculture was to select 200,000 acres of Nelson Act pine lands. The timber on this land was then sold; however, the purchaser would be required to leave five percent of the pine timber standing for reforesta-

tion purposes. That acreage was termed "forestry lands." Also reserved from sale or settlement were,

> the timber and land on the islands in Cass Lake and in Leech Lake, and not less than one hundred and sixty acres at the extremity of Sugar Point, on Leech Lake, and the peninsula known as Pine Point, on which the new Leech Lake Agency is now located, which peninsula approximates seven thousand acres, and in addition thereto ten sections in area on said reservations last aforesaid, to be selected by the Forester of the Department of Agriculture, with the approval of the Secretary of the Interior, in lots not less than three hundred and twenty acres each in contiguous areas. . . .

The act specified that both the islands and the points would remain Indian land.

The Nelson Act was again amended on May 23, 1908, at ch. 193, 35 Stat. 268, to provide for the creation of a national forest in Minnesota. It encompassed the ten sections, islands, and points reserved in the 1902 act as well as additional specifically described lands. As to the former areas, the Forester was authorized "from time to time to sell and dispose of so much of the standing timber thereon as he may deem wise and advisable in the conduct of a National Forest." With respect to the latter areas, the Secretary of the Interior was "authorized to proceed with the sale of the merchantable pine timber," reserving ten percent instead of the five percent provided for in the 1902 act. A "commission of three persons" was to "at once be appointed" in order "forthwith to appraise the value of the five per centum of timber heretofore reserved ... and the ten per centum hereafter reserved under the provisions of this Act, and the timber upon said ten sections and upon the unappropriated lands on said islands and points. . . ." The actual acreage of land included under the act was also to be determined and the value of the timber plus the value of the land (at $1.25 per acre) were to be paid into the permanent fund established under section 7 of the Nelson Act. Finally, the amendment

act provided compensation to the commissioners for a maximum of ten days.

Between the passage of the 1902 and 1908 forestry acts, Congress once again turned its attention to the cession of land. As a result of an act of February 20, 1904, ch. 161, 33 Stat. 46, the Red Lake band ceded to the United States approximately 256,152 acres of its reservation. All band members living in the ceded portion agreed to move to the diminished reservation. The United States agreed to sell the ceded land under the homestead laws for the benefit of the Red Lake band alone. It similarly recognized that the diminished reservation was possessed solely by the band and agreed to allot 160 acres of it to each band member.

Considering the amounts ceded by the Red Lake band in 1863 and 1904 along with the Nelson Act cession, the band ceded to the government about 11,000,000 acres. As of 1904 it occupied a reservation of just over 400,000 acres. In 1916, Congress took about 107,000 of those acres for the Red Lake Indian Forest. Ch. 125, 39 Stat. 123, 137 (May 18, 1916).

The remaining relevant legislation during this period was passed between 1909 and 1934. It authorized the Chippewa to bring suit in the Court of Claims on certain matters about which they had grievances but no other means of redress. The results of that litigation will be discussed in the next section of this decision.

E. Early Litigation

The first major litigation on behalf of the Chippewa involved the Mille Lac band. Pursuant to ch. 126, 35 Stat. 619, approved February 15, 1909, the Court of Claims was given jurisdiction to hear suits brought by that band or the Chippewa "by reason of the opening of the Mille Lac Reservation in the State of Minnesota, embracing about sixty-one thousand acres of land, to public settlement under the general land laws of the United States...." In *Mille Lac Band of Chippewas v. United States*, 47 Ct.Cl. 415 (1912), the band contended that under the 1863 and 1864 treaties they were grant-

ed permanent occupancy of their reservation; that they never violated the terms of that grant; and that when they assented to the Nelson Act the reservation should have been sold with the other land ceded at that time. They argued that when prior entries under the public land laws were approved, they were deprived of the benefits of the Nelson Act as to their reservation.

The Court of Claims agreed, finding that the band was entitled to payment for their reservation in accordance with the Nelson Act provisions. After discussing the circumstances of the 1863 and 1864 treaties and the band's strong attachments to its reservation, the court noted that section 6 of the Nelson Act, which validated certain homestead and preemption entries made on Chippewa land, could be construed to defeat the band's right of recovery. It found, however, that it did not. Noting that many of the entries made on Indian land were fraudulent, the court found that

It is hard to believe that the Government of the United States would by express treaty stipulations grant a right to peaceable, loyal, and well-behaved Indians, a right doubly sacred to them, and then, in not to exceed seven years from the date of said grant, countenance their ejectment from the lands so granted by a series of fraudulent entries under the general land laws. If the Government intended the Mille Lac Indian Reservation to be open to entry and settlement under the general land laws, it would have so announced, removing all doubt, and doing as is usually done under similar circumstances.

47 Ct.Cl. at 451. Based on its findings, the court entered judgment for the band.

On appeal, the Supreme Court reversed. *United States v. Mille Lac Band of Chippewa Indians in the State of Minnesota*, 229 U.S. 498, 33 S.Ct. 811, 57 L.Ed. 1299 (1913). It held that section 6 of the Nelson Act was intended to adjust the controversy between the parties as to the extent of the grants made in 1863 and 1864 by concessions on both sides, *i.e.*, that the Mille Lac lands would go into the pool ceded under

the Nelson Act but that all subsisting bona fide entries would be carried to patent. The Court found that section 6 was "plain and unambiguous," *id.* at 507, 33 S.Ct. at 815, and that the band gained a substantial benefit in assenting to the Nelson Act—the right to share in the proceeds of the sale of the remaining Chippewa land to which they would otherwise have no claim. Since only bona fide entries were authorized to be patented, the Court remanded the case for proof of damages, based on application of the Nelson Act prices to those parts of the reservation which had been disposed of improperly.

On remand, 51 Ct.Cl. 400 (1916), the court found that the 29,335.50 acres under entry prior to 1889 were properly disposed of and that the Mille Lac were entitled to no payment for them. As to the remaining 31,692.64 acres, the court ordered a judgment of $711,828.47, reduced to $689,460.54 by agreement of the parties. By the Act of September 8, 1916, ch. 464, 39 Stat. 801, 823, the award was credited to the Nelson Act permanent fund.

On May 14, 1926, Congress granted jurisdiction to the Court of Claims to hear equitable claims of the Chippewa regardless of the statute of limitations, arising under the Nelson Act or subsequent Indian legislation. Ch. 300, 44 Stat. 555, as amended April 11, 1928, ch. 357, 45 Stat. 423. In *Chippewa Indians of Minnesota v. United States*, 80 Ct.Cl. 410 (1935), ("H–76"), the Minnesota Chippewa other than the Red Lake band argued that by the Act of February 20, 1904, Congress unlawfully took land which had been ceded in trust under the Nelson Act and included it in a different trust for the sole benefit of the Red Lake band. The court dismissed plaintiffs' petition, finding that the portion of the Red Lake Reservation not specifically ceded under the Nelson Act remained Red Lake land, so that in 1904, when it was again diminished to a 400,000 acre reservation, both the proceeds of the sale of that land and the right of occupancy on the remaining portion properly belonged to the Red Lake band. This was so despite the fact that more land than was needed for allot-

ments was reserved. The band understood their otherwise ambiguous agreements with the government that way and the parties acted consistent with such an understanding.

On appeal, the Supreme Court affirmed, finding that the House committee report in which the Nelson Act had been introduced was in error in believing that all of the Chippewa land prior to 1889 had been owned in common by all of the bands. *Chippewa Indians of Minnesota v. United States*, 301 U.S. 358, 57 S.Ct. 826, 82 L.Ed. 599 (1937). Because it found that title to the Red Lake reservation at that time was solely in the Red Lake band, and since the government may not "give the lands of one tribe or band to another, or ... deal with them as its own," *id.*, at 375–376, 57 S.Ct. at 833, the band was entitled to its land without reimbursement to the Nelson Act fund.

The 1926 jurisdictional act was amended on June 18, 1934, ch. 568, 48 Stat. 979. The Chippewa then sued for the value of the land and timber appropriated in 1902 and 1908 for the Minnesota National Forest. *Chippewa Indians of Minnesota v. United States*, 87 Ct.Cl. 1 (1938) ("H–192"). The tribe claimed that because the commission to be appointed under section 2 of the 1908 act did not complete its work until 1923, the latter should be the date of appropriation for purposes of placing a value on the timber in the forest. The tribe claimed it was due reimbursement for pine trees which in 1908 were under ten inches in diameter and therefore, according to the commission, of no merchantable value at that time, since the commission estimated that they had a value of $1,060,887.70 by 1923. The court disagreed, finding that the 1908 act represented a grant *in praesenti*, so that plaintiffs were entitled to recover only the 1908 value of the land and timber and not its value at a later date. A second claim was not allowed because it arose prior to the Nelson Act and thus was outside the scope of the jurisdictional act. Finally, because plaintiffs were entitled to no recovery, the court did not consider the

offsets claimed by the government. On appeal, the court's decision was affirmed in all respects. 305 U.S. 479, 59 S.Ct. 313, 83 L.Ed. 300 (1939).

*Chippewa Indians of Minnesota v. United States,* 88 Ct.Cl. 1 (1938) ("H–155"), was brought pursuant to the same jurisdictional act. There, plaintiffs contended that the government breached its duty as trustee under the Nelson Act by expending funds for purposes other than those specified therein. The court found, however, that the Nelson Act constituted an abandonment of the band organization and a return to a single tribal organization, but that it was not a relinquishment by Congress of its authority and control over the Indians. Thus, it found no right of recovery on the theory that the Nelson Act "in any sense emancipate[d] the Indians, render[ed] them *sui juris,* or dissolve[d] the relationship of guardian and ward previously existing." *Id.* at 31. With this as its basis, the court examined and rejected plaintiffs' claims that amounts of money expended by the government for their benefit which were not specifically authorized or were beyond the exact amounts authorized were not reimbursable to the government. It held that all money taken from the fund was appropriated by Congress and was paid directly to the Indians or for their benefit; that defendant in no way profited from the expenditures; and that the expenditures were necessary.

On appeal, the Supreme Court agreed that the Nelson Act "did not create a technical trust." *Chippewa Indians of Minnesota v. United States,* 307 U.S. 1, 3, 59 S.Ct. 687, 688, 83 L.Ed. 1067 (1939). In light of Congress' authority with respect to Indians and its purpose to deal with the Chippewa on a tribal rather than individual basis, the Court held "that the Act did not tie the hands of Congress so that it could not depart from the plan envisaged therein, in the use of the tribal property for the benefit of its Indian wards." *Id.* at 5, 59 S.Ct. at 389.

Plaintiffs next brought suit seeking $1.25 per acre for 387,810.52 acres of land as well as payment for 216,305,000 feet of timber allegedly on that land, on the theory that allotments made by the government to individual members of the tribe were more generous than those allowed by law, to the detriment of the Nelson Act fund. *Chippewa Indians of Minnesota v. United States,* 90 Ct.Cl. 140 (1940) ("H–163"). Citing both its own decision and that of the Supreme Court in H–155, the court rejected plaintiffs' petition, holding that the only difference between the earlier case and this was that the former asserted mismanagement of tribal funds while the latter was based on alleged mismanagement of unsold tribal lands and timber. No appeal was taken.

The final litigation under the 1926 jurisdictional statute was *Chippewa Indians of Minnesota v. United States,* 91 Ct.Cl. 97 (1940) ("M–135"), in which plaintiffs sought to recover the amount allegedly owed them as a result of improper estimates of the amount of timber on the land ceded in the Nelson Act. The court found that the examiners appointed to appraise the timber were inexperienced and not sufficiently supervised, and that their estimates of standing timber on the land were consistently and substantially below revised estimates made later by expert examiners. Plaintiffs were found to be entitled to recover for the actual stumpage ceded as well as to be repaid for their reimbursement of the government's costs of the inaccurate examination and estimates. The recovery to which plaintiffs were entitled, however, was exceeded by offsets to which defendant was entitled for payments made by it to the Indians. No appeal of this decision was filed.

## F. The Indian Claims Commission

The next significant development in these cases occurred on August 13, 1946 with the creation of the Indian Claims Commission ("Commission"). The Indian Claims Commission Act, Pub.L. No. 79–726, 60 Stat. 1049, was codified at 25 U.S.C. §§ 70–70v–3 ("Indian Claims Act"). Further references to these sections will be to the 1978 edition of the Code. Its purpose

was to provide a forum for the determination of claims against the United States by any Indian tribe. The claims over which the Commission was granted jurisdiction, listed in section 2 of the act, were not limited to those normally cognizable at law but included a considerably broader range of claims. Those claims are:

> (1) claims in law or equity arising under the Constitution, laws, treaties of the United States, and Executive orders of the President; (2) all other claims in law or equity, including those sounding in tort, with respect to which the claimant would have been entitled to sue in a court of the United States if the United States was subject to suit; (3) claims which would result if the treaties, contracts, and agreements between the claimant and the United States were revised on the ground of fraud, duress, unconscionable consideration, mutual or unilateral mistake, whether of law or fact, or any other ground cognizable by a court of equity; (4) claims arising from the taking by the United States, whether as the result of a treaty of cession or otherwise, of lands owned or occupied by the claimant without the payment for such lands of compensation agreed to by the claimant; and (5) claims based upon fair and honorable dealings that are not recognized by any existing rule of law or equity.

25 U.S.C. § 70a.

That section also provided that claims could not be barred on the basis of a statute of limitations or laches, "but all other defenses shall be available to the United States;" that claims accruing after the approval of the act would not be considered; and that the Commission had authority to allow offsets on behalf of the government, including reimbursement for "funds expended gratuitously" for the tribes' benefit where that is warranted "in good conscience." *Id.*

Under 25 U.S.C. § 70k the Commission was to accept claims for five years after August 13, 1946, "and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress."

At 25 U.S.C. § 701, the Commission was authorized to send to the head of each tribe and band an explanation of the Indian Claims Act and to ask for a statement of all claims. It also was authorized to establish an Investigation Division to investigate any claim referred to it by the Commission. Section 70n provided for the tribes' selection of counsel and payment of attorney fees, limited to 10% of a recovery, as well as costs incurred. Parties were provided with the right to a hearing under 25 U.S.C. § 70p, at which sworn testimony was to be taken and for which subpoenas could be issued. 25 U.S.C. § 70q. Finally, the Court of Claims was vested with exclusive jurisdiction to hear appeals from final determinations of the Commission. Court of Claims review was to determine whether the Commission's findings of fact were supported by substantial evidence, and whether its conclusions of law are valid and supported by its fact findings. 25 U.S.C. § 70s.

According to its final report, more than double the number of claims were filed in the last one and one-half months of the five year filing period than had been filed during the entire time preceding that. A total of 370 petitions were filed, which were divided into more than 600 dockets. Included among the claims were those filed by and on behalf of the Minnesota Chippewa Tribe ("Minnesota Chippewa") which was, in effect, a federation of all Chippewa bands in Minnesota except for the Red Lake. As an entity it was organized in 1936 under the Indian Reorganization Act of 1934 (Act of June 18, 1934, Pub.L. 73–383, 48 Stat. 984), codified at 25 U.S.C. §§ 461–479. Claims were also filed on behalf of the Red Lake band.

The claims still at issue in these cases were divided into five docket numbers—19, 188, 189–A, 189–B, and 189–C. Broadly stated, docket 19 raises Nelson Act accounting claims on behalf of the Minnesota

Chippewa Tribe and dockets 189–A and 189–B raise similar claims for the Red Lake band. Dockets 19 and 189–A were consolidated by the Commission. In docket 188, the Minnesota Chippewa Tribe's non-Nelson Act claims are presented; their counterpart for the Red Lake band is docket 189–C.

Although none of these claims were fully adjudicated by the Commission, it heard and acted upon several of them. To the extent that those decisions are relevant to resolution of the instant cases, the Commission's dispositions will be discussed in analyzing the current motions for summary judgment.

During the period for filing claims and while the cases were pending at the Commission, two reports were issued by the General Accounting Office (GAO), in 1950 and 1963, purporting to detail the expenditures made by the government for the plaintiffs. The 1950 report covers disbursements made during the period from January 14, 1889, the date of the Nelson Act, to the middle of 1946 for the Minnesota Chippewa, and to the end of fiscal year 1939 for the Red Lake band.[4] The 1960 report is inclusive of 1951 for both groups. In addition to the general complaints filed by 1951, plaintiffs gave specificity to their claims by filing a series of "exceptions" in each docket to the latter report. Those exceptions challenge certain disbursements or classes of disbursements, or otherwise seek a fuller disclosure of how the government accounted for plaintiffs' land, property, and money. It is on the basis of those exceptions that the case has generally proceeded since then.

Pursuant to Pub.L. 94–465, 90 Stat. 1990 (October 8, 1976), the Commission ceased operation on September 30, 1978. In that statute, the Commission was directed by December 31, 1976, to certify or transfer to the Court of Claims all cases it determined it would not completely adjudicate by its termination date. Fewer than 68 of the original 600–plus dockets were transferred, but among them were the five Minnesota Chippewa dockets, which were transferred on December 20, 1976.[5]

### G. The Court of Claims and Beyond

After transfer of the cases to the Court of Claims, the major litigation involved numerous motions to dismiss large portions of plaintiffs' complaints and exceptions based on the res judicata or collateral estoppel effect of the decisions of the Court of Claims and the Supreme Court discussed previously. Defendant asserted that issues which had been fully adjudicated could not be raised and heard again. The court denied almost all of those motions in a series of decisions issued in 1981 and 1982.[6] Representative of those decisions is *Red Lake Band v. United States*, 229 Ct.Cl. 272, 667 F.2d 73 (1981), in which the defendant sought to block plaintiff's prosecution of claim 2 in docket 189–B (asserting that defendant misclassified pine lands as agricultural and therefore got a lower price than it should have, and that it sold all land at less than fair market value) on the grounds that it was foreclosed by the decisions in number H–76.

The court noted that the Indian Claims Act had "created five essentially new causes of action" but that to the extent that a cause of action had been cognizable prior to the act it could be subject to res judicata because all defenses except ones based on the statute of limitations were continued in the act, *Id.* at 275, 677 F.2d at 75. Because clauses 3 (revision of agreements obtained by fraud or duress) and 5

---

4. Pursuant to the Act of June 15, 1938, Pub.L. 75–632, 52 Stat. 697, the amount held by the government to the credit of the Red Lake band as of the close of fiscal year 1939 was set up on the books of the Treasury as a separate account. The Red Lake share was determined by the proportion of their then-current population to that of all the Chippewas.

5. Indian claims arising after August 13, 1946 became appealable to the Court of Claims, and then the Claims Court, by 28 U.S.C. § 1505 (1982).

6. *See* 229 Ct.Cl. at 272, 667, 675, 678, 681, 707, 710, 715, 736, 816 and 822; 230 Ct.Cl. at 761, 776, 786, and 996.

(fair and honorable dealings) in particular were new, "even though a 1946 claim arises out of exactly the same facts as a 1926 (Nelson Act) claim, the 1946 claim is a new cause of action and not barred by res judicata if it is brought under clause 3 or 5." *Id.* Under the doctrine of collateral estoppel, however, the court pointed out that issues of fact will not be relitigated and even clause 3 or 5 claims will be barred if the facts necessary to determine them have previously been decided. Thus, the court held that where there is identity of parties and issues, res judicata would bar relitigation of the claim; where there is only identity of the parties, collateral estoppel is a bar if the issues decided previously preclude the possibility of success in the later action.

With specific reference to the case at bar, the court found that the parties were the same as were involved in the earlier litigation, and that the instant claims were very similar to those made in case numbers H–76, H–155, H–192, and M–135 and could have been brought as a part of those suits. However, since the instant claims were brought under clauses 3 and 5, res judicata was not a bar. And, because the court found that the issues decided in the earlier cases were similar but not identical to the ones being brought, collateral estoppel also was no bar.

On the basis of these rulings, plaintiffs have continued to prosecute their claims. The only other significant litigation since that time involved an order issued by the Claims Court on August 2, 1984, in which defendant was ordered to prepare separate accountings of amounts paid or expended specifically for the benefit of each reservation-owning band. Accounting on a band-by-band basis would have the effect of disallowing as offsets payments made by defendant to or for the tribe unless they were proven to have been made to a particular band. The appellate court vacated the order. *Minnesota Chippewa Tribe and Red Lake Band v. United States,* 768 F.2d 338 (Fed.Cir.1985). In so doing, it found that the motion for a band-by-band accounting, in substance, set forth new, untimely claims and that an amended pleading should be permitted to relate back to an earlier one only where there is sufficient notice given by the general facts set out in the earlier pleadings. Because the court found that the original and amended pleadings, as well as the later-filed exceptions, failed to give such notice, it concluded that plaintiffs could not amend their complaint at this late date to add a new cause of action. Similarly, as to the White Earth band, it found that defendant had not been put on notice that it intended to challenge the allotment of its reservation land to members of other bands, so that the issue could not now be raised. As to the Red Lake band, though, which filed separate exceptions in 1970, its claim for a separate accounting was raised there, and the trial judge had acted within his discretion in granting the request.

Since the date of the last decision, these cases have slowly been moving forward. Necessary accountings have been identified, schedules set, and progress toward their accomplishment made. A pretrial submission has been filed, setting forth in groups the multitude of individual issues raised in dockets 19 and 189–A. Numerous additional motions have also been filed and considered. Among those are the eight motions for summary judgment, or partial summary judgment, at issue here. Contemporaneously herewith, the court is also issuing an order relating to several pending procedural motions and scheduling matters.

## PLEADINGS

Stated briefly, the eight pending motions assert the following.

A. Plaintiffs' Motion for Summary Judgment of Liability Arising Out of Disposition of Mille Lac Reservation Land. Based on the treaties of 1863 and 1864, plaintiffs contend that the Mille Lac band was promised a reservation in return for their good conduct, but that through a series of conveyances confirmed as a result of the Nelson Act, that reservation was taken

from them. Under clauses 3 and 5 of 25 U.S.C. § 70a, they seek, for the band, the fair market value of the land which the Supreme Court in 1913 held had not been ceded under the Nelson Act, and for the tribe, the fair market value of the acreage which was then ceded.

B. Plaintiffs' Motion for Summary Judgment Declaring Liability for the Value of Tribal Land and Timber Taken for the Minnesota National Forest. In this motion, filed under clause 5 of 25 U.S.C. § 70a, plaintiffs recite the history of the acts of 1902 and 1908, as well as of case number H–192, and assert that at least nine "badges of unfair and dishonorable dealings" by the government are evident in that history which entitle them to the fair market value, as of May 23, 1908, of all tribal lands and timber taken for the Minnesota National Forest.

C. Plaintiffs' Motion for an Order Declaring Advance Interest Reimbursable Only From Interest. It seeks a finding that section 7 of the Nelson Act requires that the advance interest payments made to plaintiffs be reimbursed to the government only from interest generated by the permanent fund, and not from the corpus of the fund itself. Alternatively, plaintiffs assert that if the fund had been properly managed, there would have been no reason for the government to reimburse itself from the permanent fund.

D. Plaintiffs' Motion for Summary Judgment Concerning the Proceeds of a Judgment Against the Pine River Logging and Improvement Company. In 1902, defendant won a judgment against the named company for conversion of timber subject to the Nelson Act. Plaintiffs' motion seeks $70,761.16, the amount of interest which would have accumulated on a portion of the judgment had it been credited to the Nelson Act interest bearing fund in 1902.

Each of defendant's motions is based on a claim asserted in Plaintiffs' Pretrial Submission Pursuant to the Court's Order of January 22, 1986, filed March 3, 1986.

E. The first of defendant's submissions is Defendant's Motion for Summary Judgment on Plaintiffs' White Earth Allotments Claim. In plaintiffs' pretrial submission, they assert that defendant deliberately allotted pine lands on the White Earth Reservation rather than agricultural lands, contrary to the best interests of the tribe. Defendant now seeks summary judgment on this claim because it is not properly a Nelson Act claim under docket 19, and in any event, is barred by the statute of limitations.

F. Defendant's Motion for Summary Judgment, or Alternatively, Partial Summary Judgment on Plaintiffs' Swampland Claim. Plaintiffs' pretrial submission asserted that the United States failed to deliver the reservations promised in 1863, 1864, and 1867 because, as a result of the Swamplands Act, certain portions of those lands were patented to the State of Minnesota. Defendant argues that the entire claim is barred as a new claim not now cognizable under the Indian Claims Act. Alternatively, it asserts that at least that portion of plaintiffs' claim which asserts a breach of contract theory is barred by the doctrine of law of the case or because it is a new claim of which defendant did not have notice.

G. Defendant's Motion for Summary Judgment on Plaintiffs' Claim for Interest with Respect to Certain Nelson Act Claims. In this motion, defendant argues that if plaintiffs recover on claims that monies should have been credited earlier to the Nelson Act permanent fund, those recoveries do not accumulate interest when the funds were never in fact held in trust.

H. The final submission is Defendant's Motion for Partial Summary Judgment with Respect to Fair Market Value Claims. In this motion, defendant asserts that the alternative valuation date (March 4, 1890, the effective date of the Nelson Act) applicable to plaintiffs' various claims for fair market value is improper. In response, plaintiffs agreed and moved for leave to amend in order to delete the alternative

date placed at issue in the motion.[7] Defendant asserts that plaintiffs' filing moots its motion for summary judgment. Because the court agrees, the defendant's motion will be dismissed.

Oral argument was heard on plaintiffs' motions on August 22, 1986 and on defendant's motions on September 15, 1986. Both the oral and written representations of the parties have been carefully considered in ruling on their motions.

## ANALYSIS

### A. Mille Lac Reservation

■ As discussed above, by treaties made in 1855, 1863, and 1864, reservations were set aside for the Mille Lac band in return for cessions of land. In article XII of both the 1863 and 1864 treaties, the band was promised the right to remain in possession of its reservation "so long as they shall not in any way interfere with or in any manner molest the persons or property of the whites." It is undisputed that the band never violated that condition.

Nonetheless, over the next several years claims were filed by settlers against large portions of the reservation. In 1871, the Department of the Interior ("DOI") directed the refusal of additional entries on the land and in 1872 it ordered the cancellation of previous entries. Upon an appeal by an entryman, however, all previous entries were instead held in status quo. In 1878, that order was continued and a new order forbidding entries was issued. Those orders notwithstanding, further entries were allowed. A new Department of the Interior decision was issued in 1882, confirming Indian title to the extent of land necessary for their existence, but suspending the ultimate issue of the validity of the land entries until Congress took some action. By March 31, 1884, filings had been made against 55,976.42 of the 61,028.14 acre Mille Lac Reservation. *Mille Lac Band of Chippewas*, 47 Cl.Ct. at 424–426. The 1884 act was then passed, providing that none of

the band's land would be disposed of until further legislation by Congress.

After the passage of the Nelson Act and the agreement of the band to its terms, including the section 6 proviso, quoted above, allowing the patent of "subsisting, valid, preemption or homestead entr[ies]," DOI decided that the further legislation envisioned by the 1884 act had occurred. Congress confirmed that decision on December 19, 1893 (J. Res. 5, 28 Stat. 576). In 1898, it declared the reservation subject to entry under the public land laws and confirmed all preemption entries previously made. J. Res. 40, 30 Stat. 745. When the 1909 special jurisdictional act was passed, the suit filed in the Court of Claims by the band led to the Supreme Court decision, discussed above, holding that the Nelson Act constituted an adjustment of the controversy as to the status of the entries on Mille Lac land; that the section 6 proviso is plain and binding on the Indians; and that those lands upon which there were valid entries made prior to the Nelson Act were not ceded as a result of the act. *Mille Lac Band of Chippewa Indians*, 229 U.S. at 509–510, 33 S.Ct. at 815–816. Of the 61,028.14 acres in the reservation, 29,335.50 were held to fall within the terms of section 6 and therefore passed without compensation to the band or the tribe.

Plaintiffs point to this history and contend that the United States acted in violation of standards of fair and honorable dealings and that the Nelson Act should therefore be revised. The claim thus falls under clause 3 (revision) and clause 5 (fair and honorable dealings) of section 2 of the Indian Claims Act. They contend that there was a "special relationship" between the parties which requires the exercise of the highest fiduciary obligations by the government as a trustee; that by treaty the United States promised the band that it would not be compelled to leave its reservation if it did not interfere with the persons or property of the whites; and that despite its continuing good conduct the band was

---

7. By order of September 17, 1986, the court granted plaintiffs' motion without prejudice to defendant's right to object at a later date to the methodology proposed in the amendment.

ejected without benefit of payment for nearly half of the land. As damages, plaintiffs seek the fair market value of both the land as to which the Supreme Court held title had passed prior to the Nelson Act and the land which was ceded under that act.

In opposition, defendant asserts that the section 6 proviso is clear in its exclusion of lands disposed of prior to 1889 from the operation of the Nelson Act. It also contends that the proviso was explained to the Indians and that the government acted honorably in only allowing valid entries (*i.e.*, entries on 29,335.50 out of 55,976.42 acres) to be patented. It asserts that because the band assented to the Nelson Act, the act itself cannot constitute a breach of fair and honorable dealings; moreover, that because plaintiffs have presented no new facts, the findings of the Supreme Court suffice to show that the post-Nelson Act disposals were proper.

Upon consideration of the issues involved, the court has determined that plaintiffs are entitled to recover on the portion of their claim concerning the pre-Nelson Act disposals, and their motion for summary judgment will therefore be granted in part.

The cases discussing the relationship between the United States and its resident Indians are legion. It was in the courts that the concept of a federal trust responsibility to Indians evolved. F. Cohen, Handbook of Federal Indian Law 220 (1982). Chief Justice Marshall, in *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1830), first found that Indian tribes "may, more correctly, perhaps, be denominated domestic dependent nations ... in a state of pupilage" whose "relation to the United States resembles that of a ward to his guardian." The Court has since recognized that the two "parties are not on an equal footing" and that their positions can only be equalized by "superior justice which looks only to the substance of the right, without regard to technical rules." *Choctaw Nation v. United States,* 119 U.S. 1, 28, 7 S.Ct. 75, 91, 30 L.Ed. 306 (1886). In its guardian capacity, the government is to be "bound by every moral and equitable consideration to discharge its trust with good faith and fairness." *United States v. Payne,* 264 U.S. 446, 448, 44 S.Ct. 352, 68 L.Ed. 782 (1924). Again, in *Menominee Tribe of Indians v. United States,* 101 Ct. Cl. 10, 19 (1944), the court referred to it as "settled doctrine that the United States, as regards its dealings with the property of the Indians, is a trustee."

To this base of responsibility, the Indian Claims Act added the concept of fair and honorable dealings. The legislative history of the act frequently refers to claims under this rubric as "moral" ones. *See, e.g.,* Hearings Before the Committee on Indian Affairs of the House of Representatives, 74th Cong., 1st Sess. 6 (1935), *reprinted in* Ehrenfeld, Legislative Material on the Indian Claims Commission Act of 1946, at 117 (1946) (Legislative Materials); 92 Cong. Rec. H5314 (daily ed. May 20, 1946) (statement of Rep. Jackson), *reprinted in* Legislative Materials 602. The Department of the Interior told Congress that it anticipated that the fair and honorable dealings clause "when applied in conjunction with the other standards established by this section, would provide a yardstick for the adjudication of claims not falling within established legal or equitable principles of decision." Hearings Before the Committee on Indian Affairs of the House of Representatives, 79th Cong., 1st Sess. 141 (1945), *reprinted in* Legislative Materials 540.

The Court of Claims, too, has referred to claims which come within the ambit of the fair and honorable dealings provision as moral claims. *Otoe and Missouria Tribe of Indians v. United States,* 131 Ct.Cl. 593, 131 F.Supp. 265, *cert. denied,* 350 U.S. 848, 76 S.Ct. 82, 100 L.Ed. 755 (1955); *United States v. Oneida Nation of New York,* 217 Ct.Cl. 45, 576 F.2d 870 (1978). In referring to the provision's remedial purpose, the court stated that

it was designed to correct certain evils of long standing and well known to Congress. Fortunately, under these circumstances, rules of interpretation and construction are subordinate to the principle

that the object of all construction and interpretation is the just and reasonable operation of the particular statute, and accordingly it should be possible to construe the statute liberally to effect its remedial purpose and intent, and strictly to limit undue abrogation of fundamental rights or to prevent undue extension of extraordinary remedies.

*Otoe and Missouria Tribe,* 131 Ct.Cl. at 602, 131 F.Supp. at 271.

In order to present a valid claim under clause 5, "[t]here must be a showing that the United States undertook an obligation, a 'special relationship,' the obligation was to the Tribe, that the United States failed to meet its obligation, and that as a result the Tribe suffered damages." *Aleut Community of St. Paul Island v. United States,* 202 Ct.Cl. 182, 196, 480 F.2d 831, 839 (1973). *See also Navajo Tribe v. United States,* 176 Ct.Cl. 502, 364 F.2d 320 (1966). In discussing this relationship, the court has stated:

> Whether the responsibility be termed that of a guardian, a fiduciary, a trustee, a protector, or of a superior sovereign to a dependent people, the duty of care imposed upon the defendant would be the same. It would not reach the insurer's level nor fall to that of an outsider. The measure of accountability depends, whatever the label, upon the whole complex of factors and elements which should be taken into consideration.

*Oneida Tribe of Indians of Wisconsin v. United States,* 165 Ct.Cl. 487, 494, *cert. denied,* 379 U.S. 946, 85 S.Ct. 441, 13 L.Ed.2d 544 (1964).

The court later expanded on one important factor in determining the extent of the government's duty:

> In particular, where the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection.

*Navajo Tribe of Indians v. United States,* 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980).

Although in a situation where the government simply undertakes to do something which it is not obligated by treaty, law, or agreement to do, there is no "special relationship" and therefore no basis for recovery under clause 5, *Gila River Pima-Maricopa Indian Community v. United States,* 190 Ct.Cl. 790, 427 F.2d 1194, *cert. denied,* 400 U.S. 819, 91 S.Ct. 37, 27 L.Ed.2d 47 (1970), "[s]uch a 'special relationship' arises when United States officials tender a Treaty to Indians for adhesion." *United States v. Goshute Tribe or Identifiable Group,* 206 Ct.Cl. 401, 407, 512 F.2d 1398, 1400–1401 (1975).

In the instant case, it is clear that a special relationship exists as a result of the parties' dealings. The 1863 and 1864 treaties meet the *Goshute* test. Moreover, the Nelson Act established a trust for the benefit of the Indians. *Mille Lac Band,* 229 U.S. at 509, 33 S.Ct. at 815. Thus, if plaintiffs can prove the remaining elements discussed in *Aleut Community,* 202 Ct.Cl. at 196, 480 F.2d at 839, they are entitled to recover on their clause 5 claim.

### 1. The 29,335.50 Acres of Land Not Ceded Under the Nelson Act

With respect to the pre–1889 dispositions of land, the parties have forcefully argued their position on whether the Mille Lac band understood that the uncompensated loss of nearly half their reservation would result from their assent to the Nelson Act. Plaintiffs contend that they were unaware of it, that it was not explained to them, that the section 6 proviso is legalistic, and that legislation concerning Indians must be interpreted as the Indians would interpret it. Defendant, on the other hand, asserts that the provision was explained to the band, that the Supreme Court found it "plain and unambiguous," and that explicit language in a treaty cannot be negated in the Indians' favor. In support of its first conten-

tion, defendant points to the following explanation by a commissioner prior to the band's assent to the act:

> In regard to the settlers upon your lands, that is a matter which we will tell you about hereafter; it is a matter to be settled in Washington. Some of them have papers which they have received and they know about the position they occupy. I do not think any more will come upon your reservation; and perhaps some who are merely visiting you will leave.
>
> *There are other cases that are different; they will be carefully looked into, and whatever is right will be done.* At any rate all will be done for the best, in the interest of justice and to your satisfaction.

Defendant's Response to Plaintiffs' Motion for Summary Judgment at 4 (emphasis in original). The court cannot agree with defendant's position that this statement clearly explained that lands with valid entries would not pass under the Nelson Act. The statement fails to specify what will happen to the settlers beyond indicating that what will be done will satisfy the band. It makes no other promise, but says that the matter will later be settled in Washington and that the band will hear more about it at another time. It is simply insufficient as a basis for a finding that the Mille Lac understood the proviso.

 As defendant points out, however, the Supreme Court held that the proviso itself is "plain and unambiguous." *Mille Lac Band,* 229 U.S. at 507, 33 S.Ct. at 815. While plaintiffs are correct that doubtful expressions are to be resolved in favor of the Indians, *Antoine v. Washington,* 420 U.S. 194, 95 S.Ct. 944, 43 L.Ed.2d 129 (1975), they must not be construed in the Indians' favor to the extent that such a construction would negate its terms. *DeCoteau, Natural Mother and Next Friend of Feather v. District County Court for the Tenth Judicial Circuit,* 420 U.S. 425,

95 S.Ct. 1082, 43 L.Ed.2d 300, *reh'g denied,* 421 U.S. 939, 95 S.Ct. 1667, 44 L.Ed.2d 95 (1975). Moreover, where factual issues determined in an earlier case are also involved in a case brought under the fair and honorable dealings clause those rulings are conclusive under the doctrine of collateral estoppel. *United States v. Sioux Nation of Indians,* 207 Ct.Cl. 234, 518 F.2d 1298, *cert. denied,* 423 U.S. 1016, 96 S.Ct. 449, 46 L.Ed.2d 637 (1975); *Seminole Nation of Oklahoma v. United States,* 203 Ct.Cl. 637, 492 F.2d 811 (1974). Under the circumstances, it would appear that the court is bound by the Supreme Court's earlier holding on the clarity of the section 6 proviso.

Nonetheless, whether or not that proviso is ambiguous and regardless of whether the band understood it, the court finds that plaintiffs are entitled to recover for the pre–1889 dispositions. First, as the Court of Claims and the Supreme Court found, the purpose of the 1863 and 1864 treaties was to assure that the band could keep its reservation because of its "good conduct." The band never broke its promise not to interfere with the white people or their property. It is also significant, as the Supreme Court noted, that there were no entries in the land office records on any reservation other than Mille Lac at the time the Nelson Act was passed, *Mille Lac Band,* 229 U.S. at 508, 33 S.Ct. at 815, but that the proviso in section 6 made no specific reference to that reservation. Finally, and most important to this inquiry, is the fact that while the United States received the proceeds from sale of these lands under the land laws, the band received no compensation at all for nearly half of its reservation, 29,335.50 acres and the timber growing on it.[8]

It is no doubt true, as the Supreme Court found, *Mille Lac Band,* 229 U.S. at 506, 33 S.Ct. at 814, that one purpose of the Nelson Act was to adjust the controversy then raging as to the status of the white settlements on Mille Lac land, and that by its

---

**8.** The Court of Claims found that about 40% of the reservation could be termed agricultural land and the rest pine land. *Mille Lac Band,* 47 Ct.Cl. at 430. As discussed above, pine land is the more valuable.

assent to the act the band received a substantial benefit in the form of a share of the proceeds of the sale of the other reservations to which it had no claim. *Id.* at 508, 33 S.Ct. at 815. It is also true, however, that under the scheme of the act the band would have participated pro rata regardless of the size of its land contribution to the Nelson pool and that, had the land not been found to have been alienated prior to 1889, its sale would have inured to the benefit of all of the Chippewa. Given the broad remedial nature of clause 5, the court finds that the standard of fair and honorable dealings has been violated by the government's disposition of the land and its timber without any reimbursement to the band or the tribe. Similarly, the failure to provide any payment also constitutes a valid clause 3 claim, as it clearly equates to "unconscionable consideration." *See Nez Perce Tribe of Indians v. United States,* 176 Ct.Cl. 815, *cert. denied,* 386 U.S. 984, 87 S.Ct. 1285, 18 L.Ed.2d 233 (1966); *Osage Nation of Indians v. United States,* 119 Ct.Cl. 592, 97 F.Supp. 381, *cert. denied,* 342 U.S. 813, 72 S.Ct. 230, 96 L.Ed. 672 (1951).

Accordingly, as to this portion of its claim, the Mille Lac band is entitled to recover the fair market value of the 29,-335.50 acres of land. Because title to this land was held to have passed prior to the Nelson Act, the $1.25 per acre price set in the act is not of direct relevance. The claim belongs to the band alone since it was then the sole possessor of the Indian title to the reservation.

2. The Nelson Act Disposition of the 31,692.34 Acres

 The second portion of plaintiffs' claim in this motion is for the fair market value of the 31,692.34 acres which did pass under the Nelson Act. In essence, plaintiffs seek a ruling that under the circumstances discussed, application of that act to the Mille Lac Reservation was per se unfair and dishonorable.

Although the court has found that plaintiffs are entitled to summary judgment as to lands for which the Mille Lac received no compensation, they have not shown that the same indicia of unfairness and dishonor exist as to the Mille Lac Nelson Act lands.

Plaintiffs' claim seems to be that once having promised (in article 12 of the treaties of 1863 and 1864) that the Mille Lac band "shall not be compelled to remove" during the course of their good conduct, it was unfair to present the Nelson Act to them for assent. The Nelson Act, however, did not require that they be removed from their reservation. Pursuant to section 3, any Indian, in his discretion, could "take his allotment in severalty under this act on the reservation where he lives ... instead of being removed...." The portions of the transcript of meetings between the Mille Lac council and the government's commissioners quoted in plaintiffs' motion indicate that the band was told that and was aware of it. *See* plaintiffs' motion at 10–11, 12. Moreover, in contrast to the situation as to the land which was not subject to the Nelson Act, there is no question that band members *were* aware that they were ceding some of the land previously promised to them in return for the benefits of the act. *See* the terms of the Mille Lac band's assent, quoted in *Mille Lac,* 47 Ct.Cl. at 427, and Appendix C to plaintiffs' motion. As the Supreme Court held, those benefits were considerable, in that they thereby secured a share in the proceeds of the sale of all other Chippewa land, to which they otherwise had no claim.

 In short, the court cannot find solely on the basis of the earlier promises made to the band, that it was per se dishonorable for the government to offer them a treaty on different terms.[9] They knew

---

9. Although the court rejects plaintiffs' substantive claim, it concurs in their argument that a treaty or legislation may be challenged as being less than fair and honorable. It is clear that the existence of a law in itself is not a defense to a clause 5 claim. *See, e.g., Menominee Tribe of*

*Indians v. United States,* 221 Ct.Cl. 506, 515, 607 F.2d 1335, 1341 (1979), *cert. denied,* 445 U.S. 950, 100 S.Ct. 1599, 63 L.Ed.2d 786 (1980); *Sioux Nation,* 207 Ct.Cl. 234, 518 F.2d 1298; *Seminole Nation,* 203 Ct.Cl. 637, 492 F.2d 811. Moreover, it is clear that res judicata is not a

that they would be ceding parts of their reservation by assenting to the Nelson Act and they received compensation[10] for their assent. In fact, somewhat inconsistently, in both the 1912 suit and the present one, plaintiffs *sought* the benefits of the act. *See, e.g.,* plaintiffs' motion at 17 ("but for the use of the legalistic Section 6 proviso ... all of the reservation land would have been disposed of initially under the Nelson Act. The claimants would have received the benefit of 1889 Act compensation ..."). Since that is what they received with respect to the 31,692.64 acres which was ceded into the Nelson Act pool, and in the absence of a showing of unconscionability in compensation, the court concludes that plaintiffs are not entitled to summary judgment on this portion of their claim.[11]

### B. Minnesota National Forest

■ These claims, which involve the facts heard in docket H–192, *Chippewa Indians,* 87 Ct.Cl. 1 and 305 U.S. 479, 59 S.Ct. 313, seek (under the fair and honorable dealings clause) the fair market value of all of the land and timber taken by the United States for the establishment of the Minnesota National Forest. As discussed above, the acts of 1902 and 1908 amended the Nelson Act and set aside certain land for a forest reserve. In the main part of the forest, most of the timber was to be

cut, but first 5% (1902), then 10% (1908), of the standing pine was required to be left growing. The Forester of the Department of Agriculture was authorized to designate the trees which would remain, for purposes of reseeding the area. The 1908 act also provided for the Forester to allow the cutting of some of the timber, as he deemed advisable, on the ten sections, islands, and points.

The commission which was "at once" to be appointed to appraise the land placed in the Forest was not named, and in 1922 a "committee" instead undertook the required tasks. In accordance with its instructions the committee recommended the following payments:

| | | |
|---|---|---|
| 1. | $1.25 per acre for 190,885.23 acres of land | $ 238,606.54 |
| 2. | timber reserved on the 10 sections, islands and points | $ 914,810.09 |
| 3. | the 5% and 10% timber reserves on the 190,885.23 acres | $ 336,684.33 |
| | Total | $1,490,100.96 |

In addition, the committee also recommended the following payments:

| | | |
|---|---|---|
| 4. | interest on items 1 and 3 from 1908–1922 | $ 402,703.61 |
| 5. | the small pine and other timber[12] on the 190,885.23 acres | $1,060,887.70 |

bar here. The doctrine does not apply, despite prior litigation of the same matter, where the earlier case was not a challenge on the basis of the fair and honorable dealings clause. *Minnesota Chippewa Tribe v. United States,* 230 Ct.Cl. 776, 781–782 (1982); *Red Lake Band. v. United States,* 229 Ct.Cl. at 277, 667 F.2d at 75. This rule holds true even where the basis of the challenge is a statute. *Seminole Nation,* 203 Ct.Cl. 637, 429 F.2d 811.

**10.** In these motions plaintiffs have not argued that failure to pay fair market value alone is enough to find a violation of clause 5. *See Three Affiliated Tribes v. United States,* 182 Ct.Cl. 543, 559, 390 F.2d 686, 694–695 (1968) (a section 2 claimant who merely proves a price disparity is not entitled to recover). In order to recover under clause 3 because of unconscionable consideration, a claimant must prove a gross disparity between the price paid and fair market value. *Coast Indian Community v. United States,* 213 Ct.Cl. 129, 153–154, 550 F.2d 639, 653 (1977). The record as it now stands contains no

indication at all as to the amounts the tribe received for their timber and the relative value of the land, leaving the court with no basis for finding that the Nelson Act prices were per se unfair. Since the issue has not been raised more directly, the court will not decide it here. The issue has been raised, however, in plaintiffs' pretrial submission. The instant decision presents no bar to plaintiffs' prosecution of that claim and, if successful, to the recovery of fair market value for this portion of the Mille Lac Reservation ceded under the Nelson Act.

**11.** While the court recognizes that plaintiffs received no payment from the government for any of their reservation until they instituted suit, plaintiffs have pointed to no case law holding that such delayed payment alone constitutes a violation of clause 5.

**12.** Small pine was that which was under 10 inches in diameter at chest height. "Other" timber is any tree other than white and Norway pine.

| | | | |
|---|---|---|---|
| 6. | unsold timber on 18 forty-acre tracts | $ | 183.17 |
| 7. | 90% of the timber on pine lands erroneously classified as agricultural | (not valued) | |

It should be noted that the value of the timber reflected in these items was appraised as of 1923, rather than 1908, because defendant expected a result more generous to plaintiffs by using the later valuation date. The committee found, however, that the reverse was true because of destruction of some of the timber between 1908 and 1923 and since logging companies would not pay as high a price to cut in an area where 90% of the trees had already been removed as they would to cut in a heavily forested area.

When the committee finished its work, the commission envisioned by the 1908 act was appointed.[13] It recommended payment for items 1–3, with a small difference in dollar value, totaling $1,490,195.58. The recommendation was approved and that amount was credited to the Nelson Act permanent fund on May 31, 1923. The commission also recommended payment for items 4, 6, and 7, amounting to $422,939.01. Congress approved, and that amount, plus interest since 1923 ($70,105.53), was credited to the non-interest bearing account of the tribe in 1926. A bill was introduced in the House of Representatives in 1923 (H.R. 68–28) to compensate the tribe for item 5 as well, but no action was taken by the House Committee on Indian Affairs and the amount was not paid.

When the special jurisdictional act was passed in 1926, the Chippewa sued, contending that they were entitled to $1,060,-887.70, the 1923 value of the timber referenced in item 5. In H–192 the issue before the court was the proper valuation date for the property which became part of the Forest. Both the Court of Claims and the Supreme Court held that the land and timber were appropriated by the 1908 act and not, as plaintiffs contended, by the President's 1923 approval of the commission's report. Because both courts concluded that the timber was without merchantable value in 1908, plaintiffs could recover nothing.

There are two aspects to the relief sought in plaintiffs' pending motion: 1) the fair market value of the property for which they contend the government paid nothing—the timber discussed in item 5 and the land comprising the ten sections, islands, and points; 2) the fair market value of items 1, 2, 3, 6, and 7, property for which they say only a "partial payment" was made. In support of both, plaintiffs list nine "badges of unfair and dishonorable dealings," which they assert compel the conclusion that defendant did not deal fairly and honorably. They include taking trust land and timber for its own purpose without promptly paying for it; delaying 14 years in appointing the commission required by the 1908 act and then giving it limiting and erroneous instructions as to valuation of the land and timber; fixing $1.25 per acre as the price for the land; appointing three federal employees to the commission, only one of whom was selected by the Chippewa; and limiting compensation for the commission to ten days.

Defendant's response is that the claim for the timber listed in item 5, above, is barred by the Supreme Court's decision that it had no merchantable value in 1908, that genuine issues of material fact remain unresolved, and that there are many indications the government acted fairly and honorably.

### 1. Land Comprising the Ten Sections, Islands and Points, and Item 5 Timber

Upon consideration of the parties' arguments, the court finds for plaintiffs on the liability aspects of their claim related to the ten sections, islands, and points, and the item 5 timber. As to that property, no

---

**13.** Plaintiffs posit that the committee was formed to avoid the limitation in the 1908 act on providing compensation to the commission for no more than 10 days. The commission's January 16, 1923 report, at 2–3, appendix 5 to plaintiffs' motion, supports this view.

compensation was ever received.[14] For the reasons discussed in connection with the Mille Lac motion, this action constitutes unfair and dishonorable dealing, and hence plaintiffs are entitled to summary judgment.

Defendant insists that summary judgment should not be granted precipitously when dealing in fact intensive areas, citing *Yuba Goldfields v. United States*, 723 F.2d 884 (Fed.Cir.1983), and that where genuine issues of material fact are in dispute summary judgment is inappropriate, *Little Earth of United Tribes, Inc. v. United States Department of Housing and Urban Development*, 584 F.Supp. 1292 (D.Minn.1983), propositions with which this court would not disagree. As to that portion of plaintiffs' motion which the court has granted, however, defendant has pointed to no genuine issues of material fact which make the court's decision "precipitous." The lack of any compensation for this property, which is not disputed, forms the basis for the summary judgment on the issue of liability.

However, the court finds that on the record as it now stands plaintiffs have demonstrated no present entitlement to damages. As to the land on the ten sections, islands, and points, defendant has not asserted that it was without value, and if the terms of the Nelson Act had been applied to this land, plaintiffs would have received payment for it at $1.25 per acre. Because of the findings of the Court of Claims and the Supreme Court in H–192, though, a greater problem exists in placing a value on the item 5 timber, which was not in a category compensable under the Nelson Act scheme.

■ With respect to the item 5 damages, defendant is correct that the general rule is that property is to be valued as of the date on which it is appropriated. *Warm Springs Tribe of Indians of Oregon v. United States*, 103 Ct.Cl. 741 (1945). That is true even in a fair and honorable dealing claim. *Seminole Nation of Oklahoma v. United States*, 204 Ct.Cl. 655, 498 F.2d 1368 (1974), *cert. denied*, 420 U.S. 907, 95 S.Ct. 825, 42 L.Ed.2d 837, *reh. denied*, 420 U.S. 984, 95 S.Ct. 1415, 43 L.Ed.2d 666 (1975). Where at the date of taking there is no value, no damages are awardable, *id.*, despite the fact that the property might later become valuable. *Warm Springs Tribe*, 103 Ct.Cl. at 745.

■ Nonetheless, the court rejects defendant's argument that the finding of the Supreme Court that the trees in item 5 had no merchantable value forecloses any further inquiry into the matter. In *Red Lake Band*, 221 Ct.Cl. at 331, 607 F.2d at 934, the court held that only issues of fact or law actually litigated in an earlier case, where the determination of the issue was essential to the judgment, are conclusive in a subsequent action between the parties. *See also Parklane Hosiery v. Shore*, 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979). Clearly, in docket H–192 the value of the timber accounted for in item 5 was not actually litigated or necessary to the judgment. In that case the only issue was the proper valuation date—1908 or 1923. Plaintiffs did not litigate the 1908 value inasmuch as they sought the 1923 value, and the determination that there was no merchantable value in 1908 was not directly relevant to the conclusion that the appropriation of the forest lands and timber did not occur in 1923. Further, as plaintiffs point out, because the creation of a new cause of action in the Indian Claims Commission Act was not foreseeable when H–192 was being decided, the possibility of subsequent litigation was sufficiently remote that the parties may have had no incentive to litigate the issue fully, so that collateral estoppel should not apply. *See Red Lake Band, id.* 221 Ct.Cl. at 332, 607 F.2d at 934–935.

■ Having found that the court is not bound by the decisions in H–192, however,

---

14. The record does not demonstrate with great clarity that the land for which plaintiffs were paid in item 1 fails to include this acreage.

However, in their reply brief at 4 plaintiffs plausibly assert why that is the case and defendants have not challenged that assertion.

the court further finds no present entitlement to damages with respect to item 5. The only evidence in the record on the 1908 value of the trees, the reports of the committee and the commission, state that they were "not considered merchantable" or that "there was generally no market" for them, committee report at 19, appendix 4 to plaintiffs' motion, and "the preponderance of the evidence was to the effect that ... [they were] not commonly regarded as merchantable in 1908." Commission report at 19, appendix 5 to plaintiffs' motion.

### 2. Property For Which Compensation Was Received

■ With respect to the second part of plaintiffs' claim, the motion for summary judgment is denied. That portion of the motion concerns the land and timber for which plaintiffs received payment under the Nelson Act as amended by the 1908 act, or because of the appraisals of the committee and commission. The court finds that the "badges of unfair and dishonorable dealings" plaintiffs point to are insufficient as a basis for recovery under the circumstances present here. For example, although there was a long delay before the United States paid for this property, plaintiffs received interest on the sums finally paid. Further, although the ten days allowed for the commission to do its work were thought to be insufficient, the government established the committee to avoid that problem and plaintiffs have made no showing that the amount of time it actually expended on the survey and valuation project was insufficient or detrimental to

their interests. Similarly, plaintiffs have not demonstrated that the commission as constituted prejudiced their interests or was so likely to do so that it was unfair per se. Finally, the erroneous instruction as to the valuation date given to the committee was intended to benefit, not harm, the tribe and cannot be considered unfair or dishonorable.[15] *See Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 336, 407–408 (1986), *appeal docketed*, No. 86–1022 (Fed.Cir. March 19, 1986). *See also Otoe and Missouria Tribe*, 131 Cl.Ct. at 642–643, 131 F.Supp. at 296.

On the other hand, indicia of defendant's good faith dealings appear in the record. For example, the acceptance by Congress of three of the committee and commission's additional recommendations for payment in the amount of $422,939.01, the payment in item 2 for timber other than pine, and the attempt through the appointment of the committee and commission to compensate the tribe for the actual value of the timber[16] all are affirmative indications that the government did not attempt to overreach as to this property.

In sum, the court concludes that plaintiffs are entitled to recover for the value of the land in the ten sections, islands, and points in accordance with the Nelson Act since title to the land should have passed under its terms, and for the value of the timber in item 5 upon proof that the timber had a market value in 1908. Since the Nelson Act did not provide a price for this timber, plaintiffs would, upon such proof, be entitled to its fair market value. In all other respects the motion is denied.

**15.** While an argument could be made that although the instruction to use the 1922 date for valuation purposes was in good faith when it was given, Congress did not act in good faith when it approved the appropriation since by then it knew of the committee and the commission's views as to the relative worth of the timber in 1908 and 1922. Any such inference of bad faith would be rebutted however, since both the committee report at 18 and the commission report at 17 recommended that "the only form of settlement equitable to the Indians" in this regard was to set the price for reserved timber by multiplying its volume by the price at which "the commingled timber" was sold by the Gener-

al Land Office. Congress adopted that recommendation and paid the price thereby determined.

**16.** The court notes, however, that defendant is in error in asserting that it attempted to give plaintiffs full value for the "land" included in the forest. As to the land, a set price was attached to it without consideration of its actual value. *Minnesota Chippewa Tribe v. United States*, 229 Ct.Cl. 736, 743 (1982) (holding that the "flat fee of $1.25 per acre" provided in the 1908 act was not a good faith effort to ascertain the true value of the land).

As found in the analysis of the Mille Lac motion, *see* n. 10, *supra,* plaintiffs' failure to prove that the payment they received under the Nelson Act and its amendments was in violation of clause 5 is not a bar to their general claim, not addressed here, that they are entitled to fair market value for all ceded property. If plaintiffs later prove that claim, it would apply equally to this land and timber, for which they have already received some payment.

## C. Advance Interest

 In recognition of the fact that the scheme established by the Nelson Act would not lead to any immediate infusion of money during the period while the ceded lands were being surveyed, classified, and put up for sale, and apparently to induce the Chippewa to assent, section 7 provided, *inter alia,* that

The United States shall, for the benefit of said Indians, advance to them as such interest as aforesaid [*i.e.,* interest on the permanent fund] the sum of ninety thousand dollars annually, counting from the time when the removal and allotments provided for in this act shall have been made, until such time as said permanent fund, exclusive of the deductions hereinbefore provided for, shall equal or exceed the sum of three million dollars, less any actual interest that may in the meantime accrue from accumulations of said permanent fund; the payments of such interest to be made yearly in advance ... and *whenever said permanent fund shall exceed the sum of three million dollars the United States shall be fully reimbursed out of such excess, for all the advances of interest made as herein contemplated and other expenses hereunder.*

[Emphasis added.]

In carrying out this provision, the United States made 21 payments of $90,000.00 be-

tween 1890 and 1911, a total of $1,890,-000.00. It reimbursed itself by taking $896,246.93 from the permanent fund on May 16, 1911, and the balance from the interest fund [17] between 1911 and 1927. In this motion, plaintiffs seek an order finding that the $896,246.93 was improperly taken from the permanent fund. Their motion is based on their assertion that section 7 requires that all advance interest payments be reimbursed from the interest fund, not the permanent fund.

In support of the motion, plaintiffs rely on the rule that Indian statutes and agreements are to be interpreted in the Indians' favor and as they would have understood them; that the Chippewa would have understood this to mean that reimbursement would come only from the permanent fund; and that such a reading is the only one consistent with the purpose of the act to create a large fund of money for the tribe's benefit. Alternatively, they argue that the same result must be reached on the basis of prudent management. In this regard, they assert that if the fund had been managed properly, ample interest would have been available for repayment from interest only and that the advance interest payments themselves could have stopped well before 1911. Plaintiffs have appended tables to their motion showing that sales occurred several years before they were credited to the permanent fund and that the $3,000,000.00 figure cited in section 7 as that point at which the United States would ·reimburse itself, had already been reached in 1905.

Defendant's response is that the statute is clear in allowing the government to reimburse itself as it did and that the Indians understood this. It contends, additionally, that plaintiffs' alternative rationale improperly presumes mismanagement by the government and is irrelevant because sec-

---

**17.** Section 7 of the Nelson Act specifies that a "permanent fund" was to be set up and that three-quarters of the interest accumulated on that fund would be paid annually to the Chippewa. The permanent fund was established as provided. In addition, a fund for receipt of the interest on the permanent fund was also established, to segregate the accumulating interest until payment. Thus, there was one interest-bearing "permanent" fund and one non-interest-bearing "interest" fund.

tion 7 authorizes the reimbursement from principal.

After careful consideration of the oral and written arguments of the parties and the statutory scheme, the court concludes: that the Nelson Act authorizes the action of the government in reimbursing itself, in part, from the principal of the permanent fund; that under all the circumstances, however, the government's actions constitute a breach of the fair and honorable dealings clause; and that damages, if any, cannot be determined at the present time.

First, although not discussed by the parties, the issue of advance interest has previously been before the court on a motion to dismiss because of res judicata.[18] In *Minnesota Chippewa Tribe v. United States*, 229 Ct.Cl. 681 (1981), the court spoke to plaintiffs' exception 8 (to the 1963 GAO report) in dockets 19 and 189–A, which constitutes the instant motion for summary judgment. In denying defendant's motion, the court held that although it might otherwise agree with defendant that a claim for reimbursement of advance interest should be barred, "plaintiffs in this consolidated case have an answer to the invocation of res judicata: their claim is ... brought under the Indian Claims Commission Act, Section 2, clauses 3 and 5." 229 Ct.Cl. at 685. Under the circumstances, the court finds that plaintiffs must proceed on this claim only under clauses 3 and 5. Thus, plaintiffs cannot proceed on their argument that the statute itself requires reimbursement only from interest.

Even if the court were not to so hold, the result would be the same. In the court's view, section 7 of the Nelson Act clearly authorizes reimbursement of advance interest payments from the principal of the permanent fund. Plaintiffs' attempt to read an ambiguity into the law but it simply contains no limitation such as they seek to imply. Rather, it states that once the balance in the permanent fund exceeds $3,000,000.00, the United States shall be fully reimbursed. Although it is true that treaties with the Indian tribes must be construed in their favor and as they would understand them, *Choctaw Nation v. Oklahoma*, 397 U.S. 620, 630–631, 90 S.Ct. 1328, 25 L.Ed.2d 615 (1970), it is also true that this well-established canon of construction cannot be used to "disregard clear expression of tribal and congressional intent." *DeCouteau*, 420 U.S. at 447, 95 S.Ct. at 1082. *See also Rice v. Rehner*, 463 U.S. 713, 733, 103 S.Ct. 3291, 77 L.Ed.2d 961 (1983). Plaintiffs' references to transcripts of meetings between the government's commissioners prior to the bands' assent to the Nelson Act (none of which evidence statements that the United States would reimburse itself only from interest) and recitals of how the Indians would have understood the provision are simply insufficient to overcome the wording of the statute.[19] That is true, too, of plaintiffs' reliance on the purpose of the act.

As a claim based on fair and honorable dealings, however, the court finds merit. First, plaintiffs' references to the purpose of the Nelson Act, while insufficient to prove that the act required reimbursement only from interest, support the conclusion that depletion of the principal in the permanent fund was not consistent with the goal of establishing a large, long term corpus to

---

**18.** Defendant's res judicata claim was based on docket H–155, discussed above. In that case, *Chippewa Indians*, 88 Ct. Cl. at 36–38, the court found no merit to plaintiffs' claim that in reimbursing itself for the advance interest payments the government took $232,011.21 more than authorized. In so holding, the court noted that there had been no contention that the money was disbursed in any other way than for the exclusive benefit of the tribe; that if Congress had been aware of the degree to which interest was accumulating it could have stopped advancing interest at least eight years sooner; and that

the Indians were not harmed in any way by the government's reimbursement of itself.

**19.** Because the court finds that the Nelson Act authorizes reimbursement from the principal of the permanent fund, plaintiffs' corollary argument that defendant breached the act by spending more than 5% of the fund, so that they should not be held to performance, is also without merit. To the extent that reimbursement from principal funds was allowed by the act, it was an additional authorization beyond the 5% limitation plaintiffs cite.

grow for 50 years before division among the then-living Chippewa. As shown by plaintiffs' references to the council meetings at which the bands were told about the provisions of the act, they were told that the money from the sale of their lands would go into a trust fund which would be preserved and then distributed among future generations after 50 years. That fund, the Red Lake band was told, "will be an immense sum." H.R.Exec.Doc. No. 247, 51st Cong., 1st Sess. 70 (1890) (cited in plaintiffs' motion at 8). Obviously, reduction of the permanent fund by nearly $900,-000.00 was not consistent with the plan to amass an "immense" fund.

Moreover, as discussed above, the United States is a trustee for its Indian tribes, *Seminole Nation v. United States*, 316 U.S. 286, 62 S.Ct. 1049, 86 L.Ed. 1480 (1942), who are "dependent wholly upon its protection and good faith." *Antoine*, 420 U.S. at 200, 95 S.Ct. at 948. The United States owes the tribes "moral obligations of the highest responsibility and trust." *Seminole*, 316 U.S. at 296, 62 S.Ct. 1054. In ruling on a similar question the Court of Claims held that where the United States had a choice of spending money from one of several funds, some of which bore no interest and others of which bore interest at different rates, it did not act in accordance with its fiduciary responsibilities when it failed to spend non-interest bearing funds first. *Menominee Tribe*, 101 Ct.Cl. at 21. In the instant case, as in *Menominee*, although the statute does not specify that reimbursement must be from interest rather than principal, it does not prevent it.

Finally, although the record is insufficiently specific at this time to form the basis for a finding, it appears—as the Court of Claims implied, *Chippewa Tribe*, 88 Ct.Cl. at 37—that had the government paid proper attention to the Chippewa accounts both principal and interest would have been credited earlier and the advance interest payments could have stopped before the passage of 21 years. As trustee for the tribe, the government was obligated to comply with its trust obligations. *Menominee*, 101 Ct.Cl. at 21. Greater care in accounting could have diminished the extent of the problem now at issue.

Under these circumstances, the court concludes that the government's actions in reimbursing itself from principal was not consistent with its fiduciary obligations and was not fair and honorable.

Having determined that there is liability on the part of the government, though, the court is unable to go beyond that holding to assess damages. No contention has been advanced that the reimbursement was improper in any way except for the fact that it came from principal, so defendant will not owe plaintiffs for the reimbursement itself. And a recasting of the plaintiffs' accounts at this time is not possible due to the lack of sufficient information on which to base it.[20] Accordingly, the court's finding on liability does not speak to the existence or quantum of damages, which must await the outcome of the production of documents ordered in lieu of a supplemental receipts accounting in the court's accompanying order.

### D. Pine River Logging

In *United States v. Pine River Logging and Improvement Co.*, 105 F. 1004 (8th Cir.1900), *aff'd*, 186 U.S. 279, 22 S.Ct. 920, 46 L.Ed.2d (1902), the United States sued on behalf of the Chippewa Indians for conversion of timber on land ceded under the Nelson Act. Judgment was entered for the government in the amount of $59,401.04, the value of the timber as of the date of conversion, and $39,284.76, the interest on that amount at 6% from date of conversion until date of payment. The total award was $98,685.80. Upon receipt, the government deposited the money in the Treasury rather than to the credit of the tribe as it should have under the Nelson Act.

---

**20.** At the oral arguments on the parties' motions, plaintiffs admitted that recasting of the accounts, rather than a money judgment, would result from a finding in their favor under clause 5. Transcript of August 22, 1986 at 126–129; transcript of September 15, 1986, at 26–27.

Thirty-six years later, by the Act of June 15, 1938, Pub.L. No. 75–617, 52 Stat. 688, Congress passed legislation to repay the Chippewa:

The Secretary of the Treasury ... is hereby, authorized and directed to credit as of July 12, 1902, the permanent fund of the Chippewa Indians of Minnesota arising under the Act of January 14, 1889 (25 Stat.L. 642), and the agreements made thereunder, with the sum of $59,-401.04, being the value of the timber at the time of conversion as awarded in that certain judgment entered in the Circuit Court of the United States for the District of Minnesota pursuant to the mandate of the Supreme Court of the United States in the case entitled "Pine River Logging and Improvement Company and others against United States" (186 U.S. 279), and which judgment was erroneously deposited July 12, 1902, in the Treasury of the United States as public money and to credit the interest fund of said Indians with interest thereon from July 12, 1902, at the rate provided in said Act of January 14, 1889, and agreements made thereunder, to the date said credit is given, together with the sum of $39,-284.76, being the amount of interest collected by the United States in said action.

According to the 1963 GAO Report at 79–80, 312 and 340, on July 21, 1938, the Secretary of the Treasury credited the interest bearing permanent fund with $59,-401.04 (the value of the converted timber) retroactive to July 12, 1902 (the date of the judgment), as well as with $39,284.76 (the interest portion of the judgment) as of July 21, 1938; and credited the non-interest bearing account [21] with $106,995.10 (interest on the $59,401.04 at 5%—the Nelson Act percentage—for the period from July 12, 1902 to July 21, 1938).

In this motion, plaintiffs contend that the entire $98,685.80 should have been credited to the interest bearing fund as of July 12, 1902, and that if it had been, the additional interest which would have been earned (at 5% on $39,284.76 from July 12, 1902 to July

21, 1938) would total $70,761.16. Plaintiffs therefore seek judgment in that amount. They argue that the Nelson Act requires that "all money accruing from" the sale of ceded land be placed in the permanent fund and draw 5% interest; that the entire $98,-685.80 judgment meets that requirement, and that nothing in the act permits the United States to split a judgment paid by a third party into its component parts when paying it to the tribe. In anticipation of defendants' response, plaintiffs assert that their claim is not within the scope of the rule that the United States is not liable for the payment of compound interest (that is, interest paid on interest).

Defendant, in addition to asserting that it is immune from liability for compound interest, also argues that an award of interest on a sum not held in trust is barred; that clause 5 does not authorize an award of interest; that Congress' failure to act as the plaintiff tribe asserts it should have gives rise to no clause 5 liability; and that there are genuine issues of material fact which require the denial of the motion.

Upon consideration of the arguments of the parties, the court finds that plaintiffs have demonstrated no entitlement to recovery and their claim must be dismissed.

First, the court notes that in plaintiffs' reply to defendant's response to their motion, plaintiffs state that they "do not seek recovery of interest under the fair and honorable dealings clause. Nothing in our motion suggests such a claim." Reply at 2–3. Although not raised by the parties, it appears that the Court of Claims has held otherwise. In *Minnesota Chippewa Tribe*, 229 Ct.Cl. 681, the same case in which plaintiffs' advance interest exception was addressed, defendant moved to dismiss plaintiffs' exception 25 in dockets 19 and 189–A on the basis that it was barred by res judicata as a result of the earlier decisions of the court under the 1926 jurisdictional act. Exception 25 is the claim which is at issue in this motion. The court found that this claim was not barred because it

21. *See* n. 17, *supra.*

was "brought under the Indian Claims Commission Act, Section 2, clauses 3 and 5." 229 Ct.Cl. at 685. The court finds, therefore, that plaintiffs may proceed only under clauses 3 and 5.

■ A second point not discussed by the parties but which bears on their arguments is that it appears that the Secretary of the Treasury, in carrying out the 1938 appropriation act, misconstrued Congress' intent to the benefit of the tribe. Although it was not drafted as clearly as possible, the act anticipates the crediting of the permanent fund with the $59,401.04 value of the timber only and crediting the interest fund (*i.e.*, the non-interest bearing fund) with both the Nelson Act interest on that amount for the period between 1902 and 1938 *and* the $39,284.76 interest portion of the 1902 judgment. The legislative history attached to defendant's September 12, 1986 response to plaintiffs' supplemental submission supports this interpretation. *See* S.Rep. No. 1773, 75th Cong., 3d Sess. 1 (1938). As noted above, however, the entire judgment collected from Pine River Logging Co.—both the value of the converted timber and the interest on that value—were credited to the Nelson Act permanent fund. Only the interest caused by the delay in crediting the Chippewa fund with the judgment proceeds was put into the non-interest bearing fund.

In light of these facts the court finds it unnecessary to examine further plaintiffs' contention that the Nelson Act requires that the entire judgment be considered "money accruing from" the disposal of ceded property, inasmuch as a claim not based on clauses 3 and 5 would be barred by 229 Ct.Cl. 681. Moreover, in light of the fact that the interest portion of the *Pine River* judgment itself began drawing interest on July 21, 1938, and in consideration of the court's further findings, it is unnecessary to more directly address defendant's contention that the United States cannot be

held liable for the payment of interest on money which itself represents interest.[22]

As matters have worked out, plaintiffs are now in at least as good a position as they would have been in if the tortfeasor, Pine River, had acted in accordance with law. If that had occurred, plaintiffs would have been paid the $59,401.04 value of the timber in 1892 (the date of the conversion) and that money would have been deposited in the permanent fund at that time, to draw interest at 5% from that date. Instead, interest during the period from 1892 to the date on which the judgment was paid in 1902 accumulated at the rate of 6%. In 1938, when Congress rectified its error, the Secretary of the Treasury credited the permanent fund with the value of the timber which it had collected, paid interest on that sum for the period of its 36 year delay, and also credited the permanent fund with the interest portion of the judgment. Thus, as a result of the tort, the tribe was actually benefited by receiving interest for the period from 1892–1902 at 1% higher than it would have been entitled to receive under the Nelson Act, and by receiving interest, starting in 1938, on the interest portion of the judgment.

Even if Congress' intent had been carried out and the interest portion of the judgment had been placed in the interest fund and immediately paid out, the tribe would still have suffered no detriment as a result of the government's delay. True, the United States had the use of the entire judgment for 36 years and paid interest to the tribe for that period only on approximately three-fourths of it. However, absent detriment to the tribe, in light of the fact that recovery would provide a benefit beyond what it would have been entitled to in the absence of the tort, and absent any indication of bad faith on the part of the government, the court finds that plaintiffs have not established as a matter of law that they are entitled to recover. *See Navajo Tribe*, 9 Cl.Ct. at 381, 388 (no recovery allowed for

---

22. For this reason, too, plaintiffs' September 5, 1986 submission of documents tending to establish that the United States credited the permanent fund with money it collected from persons

who bought the right to cut timber on ceded land, including any interest collected for delays in completing the logging, will be given no further consideration.

alleged breach of trust where plaintiff already placed in the position it would have been in but for the alleged breach and "government did not deprive the tribe of any profit opportunity"). *See also* Restatement (Second) of Trusts §§ 205–206 (in conflict cases not involving flagrant acts of self-dealing, loss to the trust should be established in order to recover).

Accordingly, plaintiffs' motion for summary judgment is denied, and their claim is dismissed.[23]

### E. White Earth Allotments

■■ The first of defendant's motions for summary judgment is directed toward plaintiffs' claim, in its pretrial submission, concerning allotments made on the White Earth Reservation. Under section 3 of the Nelson Act, White Earth was to be the reservation on which all Indians who did not desire to take an allotment of land on the reservation on which they were then living were to get an allotment. Plaintiffs contend that the act contemplated that allotments would be made from land classified as "agricultural"[24] so that the Chippewa could become farmers, but that defendant deliberately made allotments of "pine" land in order to allow lumber companies easy access to the timber at low prices. They assert that this was not a tribal benefit.

In its motion defendant contends that the claim must be dismissed because it was raised in docket 19, which relates only to land ceded under the Nelson Act, and that even if it were considered a Nelson Act claim, it must still be dismissed because it is time barred for its failure to have been raised in plaintiffs' petition in docket 19 or their exceptions to the 1963 GAO report. Plaintiffs' response is that they had no way of knowing what land had been allotted or what was classified as pine land because

defendant never furnished an accounting revealing the situation. They further contend that exceptions are "pleadings subject to change as information is furnished or otherwise surfaces," response at 5, but that if the court finds that docket 19 does not cover the claim, the petition in docket 188, which calls for an accounting of "all property and money," does. The court finds that defendant's position is correct and that its motion for summary judgment must be granted.

The petition in docket 19, filed on January 22, 1948, related to claims under the Nelson Act for land and property ceded in trust by all of the Chippewa bands except the Red Lake band. The first section of the Nelson Act specifies that it authorizes the President to appoint three commissioners,

> whose duty it shall be, as soon as practicable after appointment, to negotiate with all the different bands or tribes of Chippewa Indians in the State of Minnesota *for the complete cession* and relinquishment in writing *of all their title and interest in and to all the reservations* of said Indians in the State of Minnesota, *except the White Earth* and Red Lake Reservations, and to all and so much of these two reservations as in the judgment of said commission is not required to make and fill the allotments required by this and existing acts, and shall not have been reserved by the Commissioners for said purposes, for the purposes and upon the terms hereinafter stated.

(Emphasis added.) The act, therefore, provides that that part of the White Earth Reservation not needed for allotments was ceded, but that which was to be allotted remained an Indian reservation.[25] *Minnesota Chippewa Tribe*, 768 F.2d at 342 (holding that the pleadings in docket 19

---

**23.** In light of this conclusion, it is unnecessary to address defendant's other arguments in opposition to the motion.

**24.** Section 1 of the act of February 8, 1887, ch. 119, 24 Stat. 388, known as the General Allotment Act, authorizes the allotment of land "ad-

vantageous for agricultural and grazing purposes," and thus supports plaintiffs' position.

**25.** As discussed in n. 3, *supra,* cession and reservation are generally mutually exclusive concepts.

"were limited to land ceded to the United States under the Nelson Act, and at least the portion of White Earth Reservation used for allotments was not so ceded"). *See Chippewa Indians*, 90 Ct.Cl. at 143 (distinguishing allotments made on ceded land on other reservations from the "allotments out of the reserved lands on the White Earth Reservation").

▮ If plaintiffs' White Earth claim can be maintained therefore, it is not through docket 19. Plaintiffs then suggest that the court look to docket 188. That petition, filed August 21, 1951, contains in count III, at paragraph 29, the demand for an accounting cited by plaintiffs. Such a general claim, however, is insufficient if it failed to put defendant on notice that a claim of this sort would be advanced under it. *See Minnesota Chippewa Tribe*, 768 F.2d at 340, 342. Review of the docket 188 petition and the exceptions, filed January 6, 1970, fails to reveal that this claim was raised. The Federal Circuit, *id.*, found only a limited number of references to allotments in the docket 188 petition and exceptions, and this court's review of those citations and other references to the White Earth Reservation in those pleadings gives no indication of a claim of this sort.

Plaintiffs assert that they could not have raised the claim earlier because of defendant's failure to account, but do not indicate what has more recently occurred to bring this claim to their attention. Further, their contention is belied by the fact that the instant claim relates to lands allotted to plaintiffs, on which they presumably have lived.[26] More telling still is the fact that their response to the motion for summary judgment cites in support of their position a report prepared by the House of Representatives dated 1911–1912. Moreover, the decision in *Chippewa Indians*, 80 Ct.Cl. at 447, in discussing the White Earth Reservation, stated that "allotments were made without regard to the character of the land, and large areas of land chiefly valuable for pine were allotted." Both the court's deci-

sion, which was issued in 1935, and the House Report pre-date plaintiffs' petitions and exceptions in dockets 19 and 188.

Section 12 of the Indian Claims Commission Act, 25 U.S.C. § 70k, provided that:

The Commission shall receive claims for a period of five years after August 13, 1946, and no claim existing before such date but not presented within such period may thereafter be submitted to any court or administrative agency for consideration, nor will such claim thereafter be entertained by the Congress.

Thus, plaintiffs may pursue this claim only if they are entitled to amend or otherwise add specificity to their petition or exceptions. The court finds that they are not. In *Minnesota Chippewa Tribe*, 786 F.2d at 341, the court found that the exceptions to the 1963 GAO report should be "treated as amendments relating back to the original complaints and setting forth specific claims." It disallowed the various bands from asserting a right to a separate accounting since no notice of such a claim had been given and "[t]he rule of relation back does not extend to amendments that add new causes of action...." *Id.* Allowing plaintiffs to proceed with their claim would be contrary to the Federal Circuit's direction.

Accordingly, no material facts being in dispute, and the court finding that defendant is entitled to judgment as a matter of law, the motion for summary judgment is granted. Plaintiffs' White Earth allotment claim, found at paragraph XV. A. of their March 3, 1986 pretrial submission, will be dismissed.

## F. Swampland Claim

▮ Plaintiffs' pretrial submission seeks to recover the fair rental value of swamplands patented to the state of Minnesota under the 1860 swamplands grant from the dates of the treaties which purported to include the swamp in a reservation until the effective date of the Nelson Act, and the fair market value of those

---

**26.** By act of April 28, 1904, Pub.L. No. 58–218, 33 Stat. 539, Congress completed the Nelson Act allotment plan by granting patents for 160 acres of land to all Indians living on White Earth.

lands at that time. As discussed above, the Supreme Court found in *United States v. Minnesota*, 270 U.S. 181 at 199–200, 46 S.Ct. 298 at 302, 70 L.Ed. 539, that title to all but 706 of the 152,124.18 acres of swampland thought to have been included in reservations established by the treaties of 1864 and 1867 had actually passed to the state in 1860. The tribe was compensated at the Nelson Act price, $1.25 per acre, for those swamplands.

Defendant's motion for partial summary judgment [27] asserts that category 1 of the claim is barred as a new claim or by law of the case. That portion of the claim asserts that there was a breach of contract as a result of the failure of the United States to deliver the promised swampland on the reservations. Defendant's law of the case theory is premised on its assertion that in *Minnesota Chippewa Tribe v. United States*, 14 Ind.Cl.Comm. 226 (1964), the Commission found that the reservations promised by the 1864 and 1867 treaties (Royce areas 507 and 509, respectively) had been delivered and that they contained 258,620 (Royce 507) and 36,700 acres of swampland (Royce 509). It also contends that the claim is barred by res judicata because the breach of contract theory should have been raised in dockets 18–B and 18–N, which were decided at 14 Ind.Cl. Comm. 226.

Plaintiffs' opposition asserts that the law of the case doctrine only applies to a decision in the same case as that which is under consideration, not to judgments in a different case. They also contend that neither collateral estoppel nor res judicata is applicable because the plaintiffs in dockets 18–B and 18–N were the Mississippi Chippewas, not the Minnesota Chippewa Tribe or the Red Lake band, the current plaintiffs; the acreage classified as swamp in 18–B and 18–N is not the same land patented to Minnesota; the issues raised in this claim, exception 10 in dockets 19 and 189–A, are not the ones litigated in 18–B and 18–N; if they are considered to be the same issues, the Indian Claims Commission holding is contrary to the Supreme Court's decision; and res judicata is not a bar just because the current issue could have been raised in the earlier proceeding.

After careful consideration of the parties' written and oral arguments and the relevant Indian Claims Commission and court decisions, the court concludes that genuine issues of material fact exist which preclude the grant of summary judgment.

The court concludes, first, that plaintiffs' breach of contract theory is not barred for defendant's failure to receive notice of it. As stated above, the limitations provision in the Indian Claims Commission Act provides that no "claim" existing prior to August 13, 1951 but not presented by that time may be raised. The act does not define the term "claim" and the parties have not argued its meaning. In *Minnesota Chippewa Tribe*, 768 F.2d at 341, in determining whether the United States had notice of a claim, the Federal Circuit inquired whether there were sufficient "facts alleged or issues raised." Moreover, in construing rule 10(b) of the Federal Rules of Civil Procedure, it has been held that the word "claim" "is used to denote the aggregate of operative facts which give rise to a right enforceable in the courts." *Original Ballet Russe v. Ballet Theatre*, 133 F.2d 187, 189 (2d Cir.1943); *see also Birnbaum v. Birrell*, 9 F.R.D. 72, 74 (S.D.N.Y.1948). In this case, exception 10 notes that at least 178,530.10 acres of swampland were patented to Minnesota without payment to plaintiffs and urges that the 1963 GAO report fails to show the dates of patent and to identify and quantify the acreage covered, so that plaintiffs are unable to determine their losses. The court concludes that sufficient facts and issues were raised

---

**27.** Defendant originally moved for summary judgment as to the entire claim because the Indian Claims Commission had ruled, at 29 Ind. Cl.Comm. 211, 215–219 (1972), that the instant claim could only be raised in docket 188, and plaintiffs failed to amend their 188 petition to include it. In fact, the Commission overruled that decision in *Fort Peck Indians v. United States*, 34 Ind.Cl.Comm. 29, 61 (1974), and the claim was allowed to proceed in docket 19 without amendment. *Minnesota Chippewa Tribe v. United States*, 35 Ind.Cl.Comm. 98, 104 (1974).

by exception 10 to put defendant on notice of this claim. Plaintiffs' breach of contract theory, therefore, should not be barred under the Indian Claims Act statute of limitations.

The court further finds, however, that the remainder of defendant's concerns are not as easily resolved. Although the Indian Claims Commission decision found at 14 Ind.Cl.Comm. 226, held that specific acreages of swamplands were included in the 1864 and 1867 reservations, it makes no reference to the Supreme Court's decision in *United States v. Minnesota*, 270 U.S. 181, 46 S.Ct. 298. It is unclear, therefore, whether the reservations specified by the Commission included or excluded that land which passed to the state. The Commission's opinions reported in volumes 29 and 35 of its decisions, which do discuss the Supreme Court decision, make no such specific findings as to acreage. The Supreme Court decision, to which the Chippewa were not a party, similarly did not state the size of the reservation created in 1864 and 1867, or their size as a result of the Court's decision that 152,124.18 acres thought to have been included in them were not. In addition, the Royce maps, which chart out each cession and certain of the reservations, do not state the acreage of the reservations, and, since they end in 1894, of course do not take account of the 1925 Supreme Court decision or the later Commission decisions.

Pursuant to the 1860 act, which adopted the provisions of the 1850 swamplands act, the land was divided into plots and the classification of each plot as swamp or non-swampland was to be done on the basis of the majority of its acreage. Plaintiffs persuasively argued, without contradiction by defendant, that surveyors under the act classified 40–acre square tracts in that manner, whereas appraisers hired to determine fair market value of lands use several classifications and mark each land type by its actual boundaries. The variations in methods and possibly the dates of examination lead to maps which chart the results very differently and to potentially large disparities in acreage by classification. Plaintiffs assert that the Supreme Court based its findings on the surveyors' results while the Commission report was based on the appraisers'. Transcript of September 15, 1986 at 36–38.

Considering all of these factors, the extent to which the decisions of the Commission and the Court were discussing the same acreage is not sufficiently clear to form the basis of a finding that no material issues are in dispute. In this regard, the court notes that at 29 Ind.Cl.Comm. 219, after making its (later overruled) finding that plaintiffs could not pursue their swamplands claim in docket 19, the Commission stated that if the docket were amended, it would then "order defendant to produce copies of the patents it claims are dispositive of this exception [number 10], together with any of the factual materials necessary to determine the location and acreage of the land involved and the dates they were patented to Minnesota." No such patents or other materials detailing the lands involved have been introduced.

In short, the validity of defendant's assertions of res judicata and law of the case cannot be tested because of an insufficient factual predicate. Defendant's motion fails to meet the requirements of RUSCC 56(c) that before granting summary judgment the court find "that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Accordingly, the motion is denied.[28]

28. As a result of this determination, plaintiffs' swampland claim appears to be proceeding on three different theories: breach of contract, fair and honorable dealings, and Fifth Amendment taking. Although not improper, such pleadings complicate an already complex case. With respect to plaintiffs' breach of contract claim, the court notes that it is not clear that they properly can, through this device, ignore the Supreme Court finding that the swamplands were taken in 1860 and thereby gain their fair market value as of the 1890 effective date of the Nelson Act. Nor is it clear that plaintiffs can recover a fair rental value for land which they apparently had the use of prior to 1890. Finally, although it is clear that Fifth Amendment claims are subject

## G. Interest Claims

The final motion for summary judgment filed by defendant relates to four current Nelson Act claims made by plaintiffs [29] and contests their right to recover interest on them. Defendant's contention is that any funds which should have been, but were not deposited in the permanent fund, were never "in existence" and never held in trust, and thus not subject to interest. Plaintiffs' response is that defendant's motion is premature since there has been no recovery, and improper as a motion for summary judgment since it is more like a request for a ruling on a point of law.[30] On the merits, plaintiffs contend that they are entitled to interest on any recovery because the Nelson Act specifically provides for its payment, whereas in the cases on which defendant relies there was no such authorization.

Upon consideration of the relevant precedent and the arguments of the parties, the court concludes that defendant's motion must be granted in part (insofar as it relates to plaintiffs' fair and honorable dealings claims) and denied in part (as to its assertion that no award under the Nelson Act of funds not previously held can be subject to interest).

First, the court finds that defendant's motion may be heard. Plaintiff admits that the motion raises a purely legal issue, and as defendant asserts, "where questions of law alone are involved in a case, summary judgment is appropriate." *International Association of Machine and Aerospace Workers, District 776 v. Texas Steel Co.,* 538 F.2d 1116, 1119 (5th Cir.1976), *cert.*

*denied,* 429 U.S. 1095, 97 S.Ct. 1110, 51 L.Ed.2d 542 (1977). Pursuant to RUSCC 56(c) summary judgment will be granted,

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. A summary judgment, interlocutory in character, may be rendered on the issue of liability alone although there is a genuine issue as to the amount of damages.

The motion presents a purely legal issue and there are no material facts in dispute as to it. It addresses an issue of liability and will be applicable to the continuing proceedings in these cases. Moreover, in this adjudication the court has found that plaintiffs are entitled to recover on certain of their claims. Thus, the court will address the merits of the motion.

All discussions of interest claims must start from the general proposition that interest does not run on claims against the United States without an express statutory or contract provision to the contrary or unless there has been a "taking" in violation of the Fifth Amendment. *United States v. Alcea Band of Tilla-mooks,* 341 U.S. 48, 49, 71 S.Ct. 552, 95 L.Ed. 738 (1951); *United States v. Thayer-West Point Hotel,* 329 U.S. 585, 588, 67 S.Ct. 398, 399, 91 L.Ed. 521 (1947); *Nez Perce Tribe of Indians v. United States,* 176 Ct.Cl. 815, 829 (1966), *cert. denied,* 386 U.S. 984, 87 S.Ct. 1373, 18 L.Ed.2d 453 (1967).[31] The Indian Claims Commission

---

to an award of interest, it is not clear that breach of contract claims of this sort are. *See Choctaw Nation v. United States,* 91 Ct.Cl. 320, 402–403 (1940), *cert. denied,* 312 U.S. 695, 61 S.Ct. 730, 85 L.Ed. 1130 (1941). Resolution of such issues, however, would be premature at this time.

**29.** At oral argument defendant was asked whether, given the broad scope of its theory, its motion did not actually extend beyond those four claims to include any recovery plaintiffs might get. Counsel for defendant concluded that it would, in fact, present a bar to the grant of interest on any award of funds not previously

held in trust for the tribe. Thus, under defendant's theory, only the recovery of improperly made disbursements of money once in the permanent fund would be subject to interest. Transcript of September 15, 1986 at 24–25.

**30.** Plaintiffs did not reassert this objection at oral argument, although it was raised in their written response.

**31.** *See* 28 U.S.C. § 2516(a) (1982) (interest allowable on a Claims Court judgment "only under a contract or Act of Congress expressly providing for payment thereof").

Act lacks a specific provision for the payment of interest and it has consistently been held that a recovery under that act does not bear interest. *Three Affiliated Tribes of the Fort Berthold Reservation v. United States*, 182 Ct.Cl. 543, 552, 390 F.2d 686, 690 (1968); *Osage Nation*, 119 Ct.Cl. 592, 97 F.Supp. 381; *Loyal Band or Group of Creek Indians v. United States*, 118 Ct.Cl. 373, 97 F.Supp. 426, *cert. denied*, 342 U.S. 813, 72 S.Ct. 27, 96 L.Ed. 615 (1951). Although plaintiffs stated a desire to test that rule in the Supreme Court, Transcript of September 15, 1986, at 26–27, they have submitted no argument to the court challenging it. The court concludes that to the extent plaintiffs recover on their treaty revision or fair and honorable dealings claims, or any other cause of action specified by the Indian Claims Act, they are not entitled to an additional award of interest.

▬ With respect to defendant's broader claim, however, the court finds that the precedent on which it relies forms an insufficient basis for denial of interest on sums recovered under the Nelson Act. Defendant's main reliance is on *Navajo Tribe of Indians v. United States*, 9 Cl.Ct. 227, 270–272 (1985), *appeal docketed*, No. 86–886 (Fed.Cir. February 4, 1986). In that case, the court held that interest was due only "on amounts actually held in trust and not those funds which should have been so deposited." *Id.* at 271. From this, defendant infers that "[a]ny claim for interest on sums which allegedly should have been, but were not, held in trust for plaintiffs' benefit must be denied." Motion for summary judgment at 3. However, the statute which was being interpreted in *Navajo Tribe* was not the Nelson Act but 25 U.S.C. § 161a (1982), which is entitled "Tribal funds in trust in Treasury Department; rate of interest," and provides:

All funds with account balances exceeding $500 held in trust by the United States and carried in principal accounts on the books of the Treasury Department to the credit of Indian tribes, upon which interest is not otherwise autho-

rized by law, shall bear simple interest at the rate of 4 per centum per annum.

Although an appeal is pending in that case, the court finds a sufficient difference between that language and the terms of the Nelson Act that the outcome of that appeal would in any event not be dispositive of the issue in these cases.

In contrast, the relevant portion of section 7 of the Nelson Act provides that

All money accruing from the disposal of [ceded] lands in conformity with the provisions of this act shall ... be placed in the Treasury of the United States to the credit of all the Chippewa Indians in the State of Minnesota as a permanent fund, which shall draw interest at the rate of five per centum per annum....

One obvious distinction between the two provisions is that the first is a general, catch-all statute, intended to provide for the payment of interest on funds where no other specific statute authorizes the payment of interest. The Nelson Act, on the other hand, is such a specific statute, providing directly for the disposition of the funds generated under its terms.

Second, 25 U.S.C. § 161a (1982), sets very restrictive, particular terms for the payment of interest which are absent from the Nelson Act provision. Interest is payable only where: (1) the account balance exceeds $500.00; (2) the funds are carried in principal accounts on the Treasury's books; and (3) there is no other statute authorizing interest. The Nelson Act simply requires that all money from the sale of ceded lands be placed in the Treasury and draw 5% interest.

In reference to a different statute, the Court of Claims stated that "the usual rule" was "that absent a breach of a specific treaty obligation, no interest, or its equivalent, can be allowed against the United States." *United States v. Mescalero Apache Tribe*, 207 Ct.Cl. 369, 389, 518 F.2d 1309, 1322 (1975), *cert. denied*, 425 U.S. 911, 96 S.Ct. 1506, 47 L.Ed.2d 761 (1976). Such a breach was found in *Peoria Tribe of Oklahoma v. United States*, 390 U.S. 468, 88 S.Ct. 1137, 20 L.Ed.2d 39 (1968),

*r'vg,* 177 Ct.Cl. 762, 369 F.2d 1001 (1966). There, the relevant treaty provided for the sale of lands at public auction and for the investment for the benefit of the tribe of any proceeds not paid to them directly. Interest on those investments was to be paid annually. The government sold the land at private sale instead, bringing a lower price than it should have received. The Court of Claims held the tribe was entitled to recover the difference in value. It held, however, that it was not entitled to interest on that sum since the treaty contained no explicit authorization for its payment.

The Supreme Court disagreed with the latter holding. It phrased the issue as "whether [it was] the obligation of the United States to invest unpaid proceeds which, by virtue of the United States' violation of the treaty, were never in fact received." *Id.,* 390 U.S. at 471, 88 S.Ct. at 1138. The Court answered that question in the affirmative and concluded that the tribe was entitled to recover for the defendant's failure to invest the unearned proceeds. *See United States v. Nez Perce Tribe of Indians,* 194 Ct.Cl. 490, 494–499 (distinguishing *Peoria Tribe* on the bases that the Nez Perce's recovery was under section 2, clause 3, of the Indian Claims Act and that "the Peoria treaty was of a nature that could support a decision to pay interest ... while the provision in point as to the Nez Perce Tribe was not so loosely worded...." *Id.* at 497).

In the court's view, the Nelson Act is easily as susceptible of interpretation in a manner which authorizes interest for funds recovered due to its breach. To hold to the contrary would be to reward the govern-ment for its failure to comply with the terms of the law and for its breach of the trust it established for the benefit of the Chippewa.[32] Defendant has pointed to no legislative history showing that Congress intended a different result, and in reviewing those portions presented by the parties in these cases, the court has found no such intention. Finally, given the perceived ambiguity in the statute, the court must apply the well established rule that treaties with the Indians are to be interpreted "in a spirit which generously recognizes the full obligation of this nation to protect the interests of a dependent people." *Tulee v. Washington,* 315 U.S. 681, 684–685, 62 S.Ct. 862, 864, 86 L.Ed. 1115 (1942). As the Supreme Court stated in *Choctaw Nation v. Oklahoma,* 397 U.S. 620, 630–631, 90 S.Ct. 1328, 1334, 25 L.Ed.2d 615 (1970):

These treaties are not to be considered as exercises in ordinary conveyancing. The Indian Nations did not seek out the United States and agree upon an exchange of lands in an arm's-length transaction. Rather, treaties were imposed upon them and they had no choice but to consent. As a consequence, this Court has often held that treaties with the Indians must be interpreted as they would have understood them, *see, e.g., Jones v. Meehan,* 175 U.S. 1, 11 [20 S.Ct. 1, 44 L.Ed. 49] (1899), and any doubtful expressions in them should be resolved in the Indians' favor. *See Alaska Pacific Fisheries v. United States,* 248 U.S. 78, 89 [39 S.Ct. 40, 41, 63 L.Ed. 138] (1918).

In consideration of all of these factors the court concludes that if money is recovered for a breach of the Nelson Act, the recovery may be [33] subject to an award of

---

**32.** The court recognizes that an award of interest cannot be made simply because it would be right or just to do so. *Mescalero Apache Tribe,* 207 Ct.Cl. at 391, 518 F.2d at 1323 (1975). As detailed above, however, this is not such a case.

**33.** Mention must be made of two points raised by the court at the hearing, *i.e.,* whether the $1.25 per acre price set in the act for agricultural land, and the 50 year trust period present caps beyond which the government did not consent to pay interest. As to the first, an award of interest on an amount beyond $1.25 per acre would appear, by definition, to be unrecoverable under the Nelson Act itself. The court finds that if plaintiffs proceed under the revision and fair and honorable dealings clauses no interest is awardable irrespective of the terms of the act. If, however, plaintiffs were to succeed on a fifth amendment taking claim, the entire recovery, not merely that amount over $1.25 per acre would be subject to interest. *See Fort Berthold,* 482 Ct.Cl. at 551, 390 F.2d at 690.

interest. Although the funds would not in fact previously have been held in trust that failing would have been due to a violation of the terms of the treaty.

On the basis of the above findings, it is hereby ordered that:

1. Plaintiffs' motion for summary judgment on its Mille Lac claims is granted in part and denied in part. The Mille Lac Band is entitled to recover the fair market value of the 29,335.50 acres of their reservation land, title to which was held to have passed prior to the Nelson Act. Plaintiffs may not recover for that portion which was disposed of under the Nelson Act.

2. Plaintiffs' motion for summary judgment on its Minnesota National Forest claims is granted in part and denied in part. Plaintiffs are entitled to recover, at the Nelson Act price, for the value of the land on the ten sections, islands and points, and at fair market value for the small pine and trees other than pine if they are able to prove such a value. Plaintiffs may not recover for that portion of its claim which concerns land and timber paid for under the Nelson Act or by the committee or the commission.

3. Plaintiffs' motion for summary judgment concerning advance interest is denied insofar as it asserts a statutory violation but granted under the theory of fair and honorable dealings. A recasting of the account to take this holding into consideration should be done but plaintiffs have failed to prove damages on this claim.

4. Plaintiffs' motion for summary judgment as to the *Pine River Logging Co.* decision is denied and the claim is dismissed.

5. Defendant's motion for summary judgment on plaintiffs' White Earth allotments claim is granted and plaintiffs' claim will be dismissed.

6. Defendant's motion for summary judgment on plaintiffs' swampland claim is denied based on factual disputes.

7. Defendant's motion for summary judgment as to plaintiffs' interest claims is granted in part and denied in part. Plaintiffs are not entitled to interest on any recovery, including those in the instant adjudication, based on Indian Claims Commission Act causes of action. Plaintiffs may be entitled to interest for claims based on breach of the Nelson Act.

8. Defendant's motion for summary judgment in connection with plaintiffs' alternative fair market valuation date is dismissed as moot.

It is so ORDERED.

As to the 50 year trust period, although that would seem to be a limitation on the payment of interest, *United States v. Blackfeather,* 155 U.S. 180, 193, 15 S.Ct. 64, 69, 39 L.Ed. 114 (1894), suggests to the contrary:

While the treaty bound the government to pay a five per cent annuity until the dissolution of the fund, which dissolution took place September 28, 1852 ... this dissolution terminated the stipulation for the annuity only *pro tanto.* If the government had originally accounted for the whole amount for which the court below held it to be liable, it would have paid five per cent upon this amount until the whole fund was paid over. The fund as to this amount being not yet distributed, the obligation to pay the five per cent annuity continues until the money is paid over.